The BEARE COMPANY,
Claimant–Appellee,

v.

STATE of Tennessee, Tennessee Department of Employment Security, and Rayburn A. Traughber, Commissioner, Defendants–Appellants.

Supreme Court of Tennessee,
at Jackson.

July 29, 1991.

Charles W. Burson, Atty. Gen. and Reporter, Joe C. Peel, Asst. Atty. Gen., Nashville, for defendants-appellants.

Charles W. Hill, Cynthia G. Bennett, Memphis, for claimant-appellee.

## OPINION

DROWOTA, Justice.

This tax litigation involves an appeal by the State of Tennessee and the Tennessee Department of Employment Security, Defendants–Appellants, from an order of the Tennessee Claims Commission requiring the State to refund employment security taxes that The Beare Company, Claimant–Appellee, paid to the Tennessee Department of Employment Security for the period 1982–86. The taxes were assessed against Beare by the State in 1987 after a determination was made that certain "truck hoppers," individuals who unload trucks at Beare's warehouse facilities, were Beare employees for purposes of the Employment Security Law, T.C.A. § 50–7–101 et seq. Beare sued to recover the taxes in the amount of $54,366.54, plus interest, which it had paid under protest. The Tennessee Claims Commission determined that Beare was entitled to a refund, plus interest. The issue before this Court is whether Beare is required to pay unemployment taxes on the services provided by hoppers that were paid by Beare who, in turn, was reimbursed by the carrier of the goods unloaded by the hoppers.

The essential facts in this case are undisputed. The claimant, The Beare Company, is a Tennessee corporation that owns and operates refrigerated warehouse storage plants located in Jackson and Humboldt. The Company provides storage facilities for shippers of a variety of food products which must be stockpiled and stored before being shipped to retail outlets. Specifically, Beare receives food products from a shipper, stores the products for a limited period of time, and makes the products available to be picked-up and delivered as instructed by the shipper that placed the products in storage. From 1982 to 1986, the products that Beare received for storage arrived at its facilities by truck in Jackson, and by truck and rail in Humboldt.

Most of the goods arrive at Beare's facilities stacked on wooden pallets ready for immediate storage in the cold storage facility. Products transported on pallets are unloaded from the trucks with fork-lifts by the Company's employees. The Company's employees also load these goods onto trucks when they are ready to be transported away from the warehouse. A small percentage of Beare's business involves food products which are not palleted but are stacked at random on the floor of a truck or railroad car. These goods must be placed onto a pallet before they can be stored in the warehouse. To this end, Beare uses the assistance of individuals known in the cold storage warehouse industry as "truck hoppers" in loading and unloading trucks at its warehouses. The status of these workers is the subject of this appeal.

The hoppers' work at Beare's warehouses consists of unloading (by hand) trucks by stacking boxes of food products onto the wooden pallets. After the products are stacked on the pallets, they are inspected and moved into the warehouse with a fork-lift driven by a Beare employee. The work of the hoppers is relatively simple and requires little or no supervision. A Beare employee directs them regarding the order in which trucks are to be loaded and unloaded. Most of the supervision of the hoppers is done by the truck drivers, who are not employed by Beare.

The hoppers are transient workers familiar with the labor needs of the refrigerated warehousing industry. The long standing practice in the industry is to utilize hoppers to load and unload trucks rather than full time employees. When hoppers seek work at Beare, they are not interviewed or required by Beare to fill-out an employment application. Further, the hoppers are not required to report for work at the company at any specified time of day. The hoppers generally appear for work on an irregular basis, with different ones appearing at the docks at different times. Although some of the hoppers show up on a regular basis, they are never guaranteed work on any particular day. There is no schedule for trucks to arrive or depart at Beare for

loading or unloading, and a different number of trucks arrive each day. Hoppers may arrive at the warehouse any time during the day. If there is no work at Beare, they go on to another business in search of work. Hoppers sign a document acknowledging that they are independent contractors and are told by Beare representatives that they are not employees of Beare. The hoppers do not punch a time clock; nor are they required to work a minimum number of hours on Beare's premises, and they are free to leave at any time during the day to work at other warehouses or to engage in any other type of work they wish. While working on Beare property, the hoppers wear whatever they want, but Beare employees are required to wear uniforms.

The hoppers who work at Beare are paid according to the weight of the food products they unload. Approximately 90 percent of the time, the hoppers are paid by the carriers. The remaining ten percent of the time, Beare pays the hoppers directly once a week on behalf of the carrier. Before the load is shipped, Beare negotiates with the carrier as to the price the carrier will pay the hopper. Beare pays that negotiated price to the hopper and then charges an additional four percent overhead fee or administrative cost back to the carrier. Beare does not withhold income tax or social security payments on the hoppers, and it does not provide any fringe benefits to the hoppers (the hoppers are, however, permitted to use the restrooms in the warehouse). For federal tax purposes, Beare treats them as independent contractors rather than employees. This practice is consistent with the industry standard across the country. Finally, it should be noted that Beare was audited by the IRS in 1978 at which time it was determined that Beare's treatment of the hoppers as independent contractors, as opposed to employees, was proper for federal taxation purposes.

## I.

■ We approach this case mindful that pursuant to T.C.A. § 9–8–403(a)(1), a direct appeal from the Tennessee Claims Commission is governed by the Tennessee Rules of Appellate Procedure. Rule 13(d) of these Rules provides that this Court must review the Commissioner's decision *de novo* with a presumption of correctness unless the preponderance of the evidence is to the contrary. It is the burden of the Defendants to establish that the preponderance of the evidence is contrary to the Commissioner's findings. *See Capital City Bank v. Baker*, 59 Tenn.App. 477, 442 S.W.2d 259, 266 (1968).

As stated, the issue in this case is whether Beare should be required to pay unemployment premiums when it is the party that pays the hoppers on behalf of the carrier. When the matter was tried, the Commissioner held that the employment taxes were wrongfully collected and ordered that the money be refunded with interest. In reaching that decision, the Commissioner determined that the hoppers must be treated as independent contractors for Tennessee unemployment premium purposes because they are so treated for federal unemployment tax purposes. On appeal, the Defendants contend that the hoppers are Beare employees, while Beare's position is that the hoppers are independent contractors and, accordingly, it is exempt from paying employment security taxes for their services.

The Tennessee Employment Security Law, T.C.A. § 50–7–101 et seq., was enacted for the purpose of supplementing a worker's resources during unemployment. *Balding v. Tennessee Dept. of Emp. Sec.*, 212 Tenn. 517, 370 S.W.2d 546 (1963). The benefits paid to unemployed persons eligible for unemployment compensation is provided by an insurance program funded by a tax on employers. Every employer who receives services performed by an employee in his "employment" as defined in T.C.A. § 50–7–207, is obligated to make contributions to the unemployment compensation fund, unless the services are excluded from coverage under the provisions of T.C.A. § 50–7–207(c).

For purposes of the Tennessee Employment Security law, "employment" is de-

fined in T.C.A. § 50–7–207 which provides in pertinent part:

> **Employment.**—(a) Definition of Employment. For purposes of this chapter and subject to the special rules contained in subsection (e), and the definitions contained in subsection (f), "employment" means service that meets all of the following conditions:
>
> (1) It is within any category of "included service" as listed in subsection (b);
>
> (2) It is not within any category of "excluded service" as listed in subsection (c); and
>
> (3) It is within any category of "Tennessee service" as listed in subsection (d).

"Included service," referred to in subparagraph (1) above, is defined as "[a]ny individual who, under the usual common-law rules applicable in determining the employer/employee relationship, has the status of an employee." T.C.A. § 50–7–207(b)(2)(B). Moreover, the "special rules" referred to above in subsection (a) are found at T.C.A. § 50–7–207(e)(1), which is commonly referred to as the "ABC test" of employment:

> (e) SPECIAL RULES. The following rules shall govern for purposes of this section:
>
> (1) Service performed by an individual shall be deemed to be included service for purposes of this section irrespective of whether the common law relationship of master and servant exists, unless and until it is shown to the satisfaction of the commissioner that:
>
> (A) Such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under any contract for the performance of service and in fact; and
>
> (B) Such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the service performed.

The "common-law rules applicable in determining the employer/employee relationship" which apply under T.C.A. § 50–7–207(b)(2)(B) were stated in *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654 (Tenn.1982): "There are a number of indicia to be considered by a trier of fact in determining the existence or nonexistence of an independent contractor relationship, such as (1) the right to control the conduct of the work, (2) the right of termination, (3) the method of payment, (4) the freedom to select and hire helpers, (5) the furnishing of tools and equipment, (6) self-scheduling of work hours, and (7) being free to render services to other entities." *Id.* at 656.

Applying the foregoing principles to the facts in this case, we conclude that the Tennessee Claims Commission correctly determined that the hoppers are independent contractors under the "common law rules" of T.C.A. § 50–7–207(b)(2)(B). Without reciting from the record at length, suffice it to say that the hoppers arrive at Beare when they want to and leave whenever they wish. The hoppers not only determine their own working hours, but they work for any company they choose on any day of the week. The only tools provided by Beare are the pallet dividers and tape. Additionally, the hoppers are hired for one load at a time which usually takes five to six hours to complete. Once the worker is finished, he may leave or begin work on another load. If a hopper stops working in the middle of a load, another hopper completes the load and each is paid for the percentage of the load he worked. Hoppers are paid on a weekly basis for the number of loads worked. When Beare pays the hoppers directly, it, in turn, bills that amount to the carrier who reimburses Beare. Although Beare is concerned that the goods are stacked properly, it does not control the hoppers while they are unloading and stacking the food. Viewing this proof together, we are persuaded that there is sufficient evidence in the record to

support the Commissioner's finding that the hoppers are not employees of Beare.

■ Turning to the "special rules" (ABC test) of T.C.A. § 50–7–207(e)(1) that must also be examined in order to satisfactorily dispose of the question before us, we note, as did the Commissioner, that the taxpayer must satisfy each of the three parts of the test in order to establish that the worker is not an employee. In other words, if the hoppers fail to meet any one of the guidelines contained in T.C.A. § 50–7–207(e)(1), they will be found to be employees and the business must pay an employment tax. Our review of the record persuades us that Beare met its burden of establishing that the hoppers satisfied the requirements of the ABC test.

With regard to that part of the test in T.C.A. § 50–7–207(e)(1) concerned with control of the worker (clause A), the record is clear that Beare exercised virtually no control over the hoppers, other than to tell them which trucks to unload. The hoppers received no other instructions from Beare. They learn how to stack and use pallet dividers from other hoppers. Although the hoppers work during the normal business hours of Beare, Beare does not set a time limit to load or unload each truck. Beare is only interested in whether or not the food is properly stacked, but it does not supervise or direct the hopper while he stacks it. The hoppers are essentially free from control of Beare and, therefore, satisfy the "A" prong of the test.

Under clause (B) of T.C.A. § 50–7–207(e)(1) the taxpayer must establish that the services performed by the workers in question were "performed *either* outside of the taxpayer's usual course of business *or* performed outside of all of the taxpayer's places of business...." T.C.A. § 50–7–207(e)(1)(B) (emphasis added.). Thus, the taxpayer has two alternative ways to satis-

fy the "B" prong of the test.[1] There is adequate evidence contained in the record to support the conclusion that the services performed by the hoppers are outside the usual course of Beare's business. Simply put, the reason is that the loading and unloading by the hoppers is primarily the responsibility of the shipper or carrier, not that of the Beare Company. In a letter made an exhibit to his deposition, the President of the International Association of Refrigerated Warehouses stated:

I understand from our members that traditionally [hoppers] are not considered employees of refrigerated warehouses. Truck shipments to and from refrigerated warehouses usually involve the loading and unloading of the trucks by the truck drivers and the truck drivers' assistants who are employees who are independent contractors of the trucking companies. The refrigerated warehouses generally do not offer the service of loading or unloading of trucks because that service is usually included in the trucking rate, thus a part of the trucking service. Since many truck drivers have no helpers on their trucks, I understand that they usually hire helpers to load and unload the trucks when they arrive at a warehouse facility. I also understand that refrigerated warehouses usually do not get involved with the arrangement between the truck drivers and the [hoppers] who hang around the warehouse facility to solicit such employment from the truck drivers.

Similarly, we agree with the Commissioner's finding regarding clause (C) that the hoppers are "customarily engaged in an independently established trade, occupation, profession, or business...." T.C.A. § 50–7–207(e)(1)(C). We concur with the following explanation provided by the Commissioner in this regard:

---

1. The Commissioner found that one of the conditions contained in clause (B) was satisfied, but not both. Apparently, the Commissioner read the disjunctive word "or" to mean "and." Specifically, it was determined below that Beare met the first alternative test, that the work performed by the hoppers was not in the usual course of Beare's business. The Commissioner found that the loading and unloading of the trucks was a function usually performed by the carrier, not the warehouse. Having reached that conclusion, it was unnecessary for the Commissioner to address whether the services were performed outside all the places where Beare does business.

As to test C, hoppers arrive at Beare when they want to—they have no set day or hours when they must be on duty. They are free to load or unload trucks at other businesses without interference from Beare. Neither Beare nor other such companies have any control of where or when the hoppers work. It is the hopper who chooses where he goes and when. Because of this freedom, it is found that the hopper is engaged in a business independent of Beare. The hoppers meet test C.

To summarize, we conclude that Beare has satisfied the provisions of clauses (A), (B), and (C) of T.C.A. § 50–7–207(e)(1). Additionally, the hoppers are independent contractors under the common law rules of T.C.A. § 50–7–207(b)(2)(B). Accordingly, we hold that the services provided by the hoppers are not "employment" for purposes of unemployment taxation pursuant to the Tennessee Employment Security Law. Having reached this result construing Tennessee law, it is not necessary for this Court to undertake an analysis of applicable federal law that, in the end, may or may not provide an alternate basis for the relief sought by Beare.

## II.

■ The final question in this case is whether the Commissioner erred in awarding interest on the sum to be refunded. The Defendants contend that Beare is not entitled to receive interest on its refund, citing as authority T.C.A. § 50–7–404(f) which provides in pertinent part:

If ... an employer who has paid such premium or interest thereon shall make application for an adjustment thereof ... or for a refund thereof ... and the Commissioner shall determine such premiums or interest ... was erroneously collected, the Commissioner shall allow such employer to make an adjustment thereof, without interest, in connection with subsequent premium payments by him, or if such adjustment cannot be made the

Commissioner shall refund the amount, without interest from the fund....

Notwithstanding the foregoing, T.C.A. § 9–8–307(d) provides that if a plaintiff is successful in a claim filed with the Claims Commission, the State must pay such interest as the Commissioner determines proper, not exceeding the legal rate as provided for in T.C.A. § 47–14–121 [2] (ten percent per annum). Moreover, the essential language contained in T.C.A. § 50–7–404(f) was in effect when this Court rendered its decision in *Elgin v. Bryant*, 181 Tenn. 317, 181 S.W.2d 329 (1944). The Court held that the statute relied upon by the defendants in that case (and by the defendants in the instant case) was not applicable when a taxpayer is forced to retain counsel and file and prosecute a lawsuit in order to obtain a refund of money it should have never had to part with in the first place. The Court affirmed the Chancellor's award of interest with respect to a refund under Tennessee's Unemployment Compensation Law. Responding to the argument that interest was not properly awarded under the predecessor to T.C.A. § 50–7–404(f), the Court stated:

[W]e think that where the unemployment compensation tax is paid under protest, and a settlement is later effected as provided in the foregoing Code section without suit, that the Commissioner is not chargeable with interest. But where the employer is not liable for the tax and is compelled to employ counsel and institute suit to recover the amount paid under protest, it is proper to allow a recovery of interest from the date of payment by the employer.

181 Tenn. 317, 324, 181 S.W.2d 329, 331. The Court's holding in *Elgin* is dispositive, and the payment of interest should be allowed with respect to Beare's claim for a refund of unemployment premiums in which it has been forced to litigate. A contrary result would surely be inequitable.

---

**2.** T.C.A. § 47–14–121 provides in pertinent part that "[i]nterest on judgments, including decrees, shall be computed at the effective rate of ten percent (10%) per annum, except as may be otherwise provided or permitted by statute...."

For the foregoing reasons, the judgment of the Claims Commission is affirmed, and the case is remanded for any further proceedings that may be necessary. Costs of this appeal shall be taxed to the Defendants.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.