# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 10, 2009 Session

## CANDACE MULLINS v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
No. T20060653     Stephanie R. Reevers, Commissioner

---

**No. M2008-01674-COA-R3-CV - Filed May 15, 2009**

---

This is a claim filed against the State by a minor-decedent's mother for the wrongful death of her child based on T.C.A. § 9-8-307(a)(1)(E) (Negligent Care, Custody and Control of Person).  The child was murdered while in the care of a relative after he had been removed from the mother's home by the Tennessee Department of Children's Services.  The mother contended that if the caseworker assigned to her son's case had properly investigated an earlier allegation of abuse at the home in which the child had been placed, the child would have been removed from the placement before the murder occurred.  The Claims Commission held that it did not have the subject matter jurisdiction to hear the mother's claims under T.C.A. § 9-8-307(a)(1)(E) because the child was not in the care, custody, or control of the State at the time of the alleged negligence.  The mother appeals.  We affirm the judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed as Modified; Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Phillip L. Davidson, Nashville, Tennessee, for Appellant, Candace Mullins.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and P. Robin Dixon, Jr., Assistant Attorney General, Nashville, Tennessee, for Appellee, State of Tennessee.

## OPINION

### I.  BACKGROUND

This case arises from the tragic death of Carlyle Mullins, minor son of Candace Mullins ("Mother").  Carlyle was born on April 25, 2000.  Just a few days short of Carlyle's fifth birthday, the Tennessee Department of Children's Services ("DCS") received a referral when Mother and her

infant son, C.H.,[1] tested positive for cocaine. As a result of the investigation, Mother's three sons, including Carlyle, were removed from their home and placed in foster care on April 18, 2005.

The next day, a team decision meeting ("TDM") was conducted to consider temporary placement of the children. According to the testimony of Sue Burfield of DCS, present at the meeting were Mother; the father of one of the other siblings; Lolitha Crook (Mother's aunt) and her husband; Latara Williams (Mrs. Crook's daughter); and several DCS officials and caseworkers, including Stephanie Hall, the case manager for Carlyle. Ms. Hall testified that Mother requested at the TDM that the children be placed with Mrs. Crook. She recalled that Mother said nothing at that time about Ms. Williams being mentally challenged, even though she was aware that Ms. Williams lived with the Crooks. At the TDM, Ms. Williams' CPR qualifications were discussed, as well as her employment history. Ms. Hall acknowledged that Ms. Williams was not individually interviewed by the DCS team to determine if she posed any threat to the children. At the conclusion of the TDM, the team concurred with Mother's request and recommended to the Davidson County Juvenile Court that the children be placed in the temporary custody of Mrs. Crook. The juvenile court subsequently awarded such custody to Mrs. Crook on April 20, 2005.

Mother testified that she did not initially complain about Ms. Williams because she had no reason to believe that Ms. Williams would be taking care of her children. She stated that she had requested that her children be placed in the care of Mrs. Crook – rather than leaving them with her mother or in foster care – because she thought her aunt would be the sole person caring for them.

Ms. Burfield testified that before DCS recommended that Carlyle be placed in Mrs. Crook's home, she performed a criminal background check, sex offender registry review, felon check, and TennKids and SSMS history search.[2] Further, Child Protective Services went out to check the home. She noted that after the children were placed with Mrs. Crook, DCS and Foster Care closed out their cases on the children. Ms. Burfield asserted that, to her knowledge, DCS has no duty to supervise the home environment in this type of placement with a family member.

Less than a month after the placement of the children, Mother called Ms. Hall to inform her that Mrs. Crook was away from the home as much as twelve hours a day and that the children were being cared for by Ms. Williams, who, according to Mother, was mentally incapable of caring for three young boys. Mother indicated that Ms. Williams had been in Special Education classes and previously had set fire to the kitchen in the Crook home. Additionally, Mother reported to Ms. Hall that Carlyle had received a burn while at the Crook home and that she had been unable to determine how the burn had occurred. Ms. Hall instructed Mother to call in an official referral. According to the DCS investigative report, "[t]he referral contained allegations of Substantial Risk of Physical

---

[1] Initials will be used to protect the anonymity of the siblings of the deceased child.

[2] SSMS is an acronym for "Social Services Management System." It is one component of a monitoring system used by Child Protective Services and Foster Care. TennKids is a newer computer system designed to integrate the information currently maintained in four systems into one child and family database.

Injury to the children because they were being cared for by Latara Williams . . . ." On the same day the referral was received, Ms. Hall went to the Crook home to investigate the claims.

Ms. Hall testified that upon arriving at the Crook home, she interviewed Carlyle in a room separate from the rest of the family and observed the child's body from the waist up. She saw scars and a mark that looked like a bite on his back. Ms. Hall remarked that, with the exception of the burn, the marks appeared to be old. The child reported that the burn on his body had occurred when he accidently bumped against a hot iron in his closet while reaching for some clothes. Ms. Hall examined the closet and found an iron on a shelf at the level of the burn on Carlyle's body. At trial, she recalled asking the child how he came to have the scars and bite marks on him, but she admitted that evidence of the inquiry was nowhere in any report, and she did not testify as to his response. She did not take any photographs or make a drawing of the marks. She testified that Mrs. Crook advised her that the marks were present on Carlyle when he arrived at her home. Based on that information, Ms. Hall conducted an online search of the TennKids database and found that Mother had a previous history of physical abuse.[3]

According to the investigative report of record, Ms. Hall related to the Internal Affairs Division of DCS that, during her interview with him, Carlyle was walking without any visible impediment, answered all of her questions, and did not seem to be in any type of fear. Ms. Hall claimed that if she had suspected abuse, she would have never left Carlyle at risk. In her deposition prior to trial, Ms. Hall described Carlyle's demeanor during her final interview with him as "still happy." She noted that he was "walk[ing] fine." She recalled that she did not observe any immediate danger during her time at the Crook home.

During her trial testimony, Ms. Hall noted that while she had made a basic visual inspection of Carlyle's younger brother, C.H., she did not interview Carlyle's older brother, M.M., or check his body for any signs of abuse. Ms. Hall acknowledged that she did not separate Ms. Williams from the rest of the family to interview her, but asserted that, to her knowledge, it was not alleged in the referral that Ms. Williams was abusing Carlyle. She further commented that she did not recall the referral stating that Carlyle had been told by Ms. Williams to not tell anybody about how the burn occurred.[4] Ms. Hall noted that Mrs. Crook denied that her daughter had been in Special Education classes, asserted that Ms. Williams was a CPR-certified lifeguard, and declared that the kitchen fire occurred accidently. Ms. Hall admitted that it had appeared to her that Ms. Williams was "mentally delayed." However, after discussing her findings with her supervisor, based on Carlyle's non-

_____

[3]When Carlyle was two years old, DCS received a referral indicating that Mother's minor sons had cigarette burns, bruises, and bite marks on their bodies. Mother claimed at trial that after the 2002 investigation, the allegations of abuse were thrown out. She further asserted at trial that when Carlyle was taken from her home in April 2005, he had no bite marks, bruises, or scars.

[4]In the State's Responses to Claimant's Request for Admissions and Interrogatories, the State admitted to an interrogatory that stated "The referent told DCS that Carlyle had a burn and could not tell her what had happened because Latara would not let him." Mother later testified at trial, however, that Carlyle had never actually told her how his arm got burned and that she really did not know any circumstances of the burn.

disclosure of abuse, Ms. Hall determined that the allegations concerning the burn were unfounded and concluded that there was no evidence that Carlyle was in immediate risk of harm. She testified that at no point during the investigation of the referral regarding the Crook home did she see anything that gave her a reason to believe that Carlyle was at risk. The investigation was closed on May 17, 2005, and no follow up investigation was conducted.

In response to questions from Mother's counsel, Ms. Hall further testified as follows regarding her investigation of the referral:

Q. Ms. Hall, when you arrived at the Crook home, it was your responsibility to protect Carlyle Mullins from any dangerous condition or any condition there that was a danger to his safety at the Crook home, wasn't it?

A. True.

Q. And, in fact, when you came to the Crook home that night you had every intention to protect Carlyle Mullins from anything . . . that put him in danger, didn't you?

A. True.

Q. Now, you also had the authority to remove him at that point if you determined that he was in any type of danger, didn't you?

A. With supervisor approval.

Ms. Hall provided the following testimony upon questioning by the State:

Q. Now, to your knowledge, is there any DCS policy or procedure that requires you to keep supervising a home environment after a court has placed custody of a minor to a family member and after the case file is closed?

A. Not to my knowledge.

* * *

Q. Now, when Ms. Mullins called you about the allegations, you told her that you couldn't just go to the home without a referral, that she needed to make an official complaint; is that correct?

A. Correct.

Q.  And that was because the case file had already been closed –

A.  Correct.

Q.  – that she had to start from scratch?

A.  Correct.

Q.  And as a result, you had to approach this referral as you would an entirely new case, right?

A.  Correct.


On May 26, 2005, Carlyle was admitted to Vanderbilt's Children's Hospital, where he was diagnosed with a right-sided subdural hemorrhage due to head trauma. He was pronounced dead the following day. An autopsy revealed that the child also had small scars that appeared to be healing burns on his right back, right shoulder, behind both ears, and a patterned abrasion on his back that resembled a bite by a human. Carlyle had multiple compression fractures of his thoracic vertebra which had caused severe injury to his spinal cord. The record reveals that the Medical Examiner determined the cause of death was inflicted head trauma and that the manner of death was homicide. Three months later, Ms. Williams was arrested and charged with first-degree murder and aggravated child abuse.[5]

Subsequent to Carlyle's death, an administrative inquiry conducted by DCS identified several concerns with how the investigation of the May 17, 2005, referral had been handled. Those concerns included: no attempt to corroborate or negate concerns about Ms. Williams' mental capacity; non-action regarding the past healing injuries; and failure to conduct a perpetrator interview with Ms. Williams. The official report revealed the following violations of the Tennessee Department of Personnel Rules and Regulations; Chapter 1120-10-.06 Disciplinary Offenses:

1.  **Inefficiency or incompetence in the performance of duties**. CM2 Hall demonstrated incompetence by not carrying out required investigative tasks during the investigation and failing to corroborate or negate all issues/allegations brought forth in the narrative of the May 17, 2005 referral.

2.  **Negligence in the performance of duties**. CM2 Hall neglected to carry out all required investigative tasks during her investigation on May 17, 2005.

12.  **Participation in any action that would in any way seriously disrupt or disturb the normal operation of the agency, institution, department or any other**

---

[5]The record contains no information as to the outcome of the charges against Ms. Williams.

**segment of the State service or would interfere with the ability of management to manage**. CM2 Hall, by her inability to carry out appropriate investigative actions during this case, caused the disruption of proper child protective services to the citizens of Tennessee.

15. **Acts that would endanger the lives and property of others**. By not conducting a perpetrator interview, child interview with sibling [M.M.] and by failing to carry out a complete investigation of all allegations in the referral received on May 17, 2005, CM2 Hall left the Mullins children at risk of further possible abuse at the hands of the alleged perpetrator who resided in the Crook household.

Mother subsequently filed a claim before the Commission alleging that DCS was negligent in its care, custody, and control of Carlyle pursuant to T.C.A. § 9-8-307(a)(1)(3) by committing the following acts of negligence:

1. Failing to maintain proper supervisory control over the actions of Mrs. Crook and the care [Carlyle] received in the Crook home;

2. Failing to conduct an adequate investigation of the environment [Carlyle] was being placed into in the first place;

3. Failing to insure that [Carlyle] was not being subjected to abuse by third parties living in the Crook home; such as screening third parties.

4. Failing to protect [Carlyle] when it was notified of potential danger to him, such as remove him from the environment.

5. Failing to make an adequate investigation to determine how [Carlyle] had been injured, thus removing him from the Crook home.

A trial was held before a Commissioner on October 4, 2007. Upon the finding that no subject matter jurisdiction existed to consider the claims, Mother filed a timely appeal.

## II. ISSUE

The issue before us is restated as follows:

Whether, as a matter of law and fact, the negligent conduct and omissions by DCS in regard to Mother's deceased child established subject matter jurisdiction before

the Claims Commission pursuant to T.C.A. § 9-8-307(a)(1)(E), "negligent care, custody and control of persons."[6]

## III. STANDARD OF REVIEW

Our review of decisions of individual claims commissioners and those of the Claims Commission are governed by the Tennessee Rules of Appellate Procedure. T.C.A. § 9-8-403(a)(1). Decisions by the Commission are reviewed pursuant to the standard of review for non-jury cases. Tenn. R. App. P. 13(d). The factual findings of the Claims Commission are reviewed de novo with a presumption of correctness. The presumption must be honored unless this court finds that the evidence preponderates against those findings. *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991). Questions of law are reviewed de novo, without a presumption of correctness. *Crew One Prods, Inc. v. State*, 149 S.W.3d 89, 92 (Tenn. Ct. App. 2004).

## IV. DISCUSSION

## JURISDICTION

In 1984, the General Assembly enlarged individual rights for seeking monetary redress against the State. T.C.A. § 9-8-307 waived the State's sovereign immunity in certain limited situations and created the Tennessee Claims Commission. *Stewart v. State*, 33 S.W.3d 785, 790 (Tenn. 2000). The Commission has "exclusive jurisdiction" over monetary claims against the State based on the acts or omissions of State employees falling within certain categories. *Id.* The purpose of the Commission is to transfer legal liability to the State from its employees. *Walker v. Norris*, 917 F.2d 1449, 1458 (6th Cir. 1990). The categories of claims over which the Commission has jurisdiction are set forth in T.C.A. § 9-8-307. If the claim falls outside the categories specified, "then the state retains its immunity from suit, and a claimant may not seek relief from the state." *Stewart*, 33 S.W.3d at 790; T.C.A. § 9-8-307(a)(1). The statute expresses that "[i]t is the intent of the general assembly that the jurisdiction of the claims commission be liberally construed to implement the remedial purposes of this legislation." T.C.A. § 9-8-307(a)(3). The *Stewart* Court recognized that, "although we have traditionally given a strict construction to the scope of the Commission's jurisdiction, we also recognize that our primary goal in interpreting statutes is 'to ascertain and give effect to the intention and purpose of the legislature.'" 33 S.W.3d at 791. Thus, the Court determined that when deciding whether the Commission has jurisdiction to hear a claim under the statute, the courts must give a liberal construction in favor of jurisdiction, "but only so long as (1)

---

[6]The Supreme Court has explained that the statute should be interpreted in the disjunctive:

> [I]t is difficult to conceive that the legislature intended to deny jurisdiction in cases where negligent control of a person by a state employee resulted in injury, even though the injured person was not actually within the care or custody of the state employee.

*Stewart v. State*, 33 S.W.3d 785, 792 (Tenn. 2000).

the particular grant of jurisdiction is ambiguous and admits of several constructions, and (2) the 'most favorable view in support of the petitioner's claim' is not clearly contrary to the statutory language used by the General Assembly." *Id.*

The jurisdiction granted under the statutes that permit suits against the State, being in derogation of the State's inherent exemption from suit, cannot be enlarged by implication. *Beare Co. v. Olsen*, 711 S.W.2d 603 (Tenn.1986) (citing *Hill v. Beeler*, 199 Tenn. 325, 286 S.W.2d 868 (1956)). The Supreme Court stated in *Stewart* as follows:

> If the legislature intends that its statutes waiving sovereign immunity are to "be liberally construed," then the courts should generally defer to this expressed intention in cases where the statutory language legitimately admits of various interpretations. A policy of liberal construction of statutes, however, only requires this Court to give "the most favorable view in support of the petitioner's claim," *Brady v. Reed*, 186 Tenn. 556, 563, 212 S.W.2d 378, 381 (1948), and such a policy "does not authorize the amendment, alteration or extension of its provisions beyond [the statute's] obvious meaning." *Pollard v. Knox County*, 886 S.W.2d 759, 760 (Tenn.1994). Moreover, "[w]here a right of action is dependent upon the provisions of a statute we are not privileged to create such a right under the guise of a liberal interpretation of it." *Hamby v. McDaniel*, 559 S.W.2d 774, 777 (Tenn.1977).

*Stewart*, 33 S.W.3d at 791.

Mother's complaint relies upon T.C.A. § 9-8-307(a)(1)(E) -- negligent care, custody and control of persons -- as its jurisdictional basis. Mother contends that because DCS has a statutory duty to screen all reports of alleged child abuse and/or neglect and to investigate referrals when appropriate, it exercised some form of control over her son, even if he was not under the State's direct care, custody and control at the time of his death. *See* T.C.A. § 37-1-401, et seq. She further argues that DCS was responsible for supervising Carlyle's environment in the Crook home for the juvenile court. According to Mother, because DCS was required to actively supervise Carlyle's temporary placement, it assumed a duty to act when the Crook home was investigated upon the referral, thereby becoming subject to the Commission's jurisdiction. She asserts that the holding in *Stewart* supports her position.

In *Stewart*, the Tennessee Supreme Court considered whether, under T.C.A. § 9-8-307(a)(1)(E), jurisdiction could be asserted outside of institutions maintained by the State. *Id.* The Court had to determine if a state trooper "had a legal duty to control local police authorities at an arrest scene – irrespective of whether he had actual care and custody over the deputies – and if he was negligent in the fulfilment of that duty." *Id.* at 792. The *Stewart* Court first said that no statute, regulation, or case law decision established a state trooper's legal duty to supervise local law enforcement officials at an arrest scene. The Court then held that the state trooper could have a duty to protect a plaintiff, however, if he assumed such a duty. In construing § 9-8-307(a)(1)(E), the *Stewart* Court held that if a state trooper had a legal duty – irrespective of whether he had actual care,

custody, and control over the individual – and if he was negligent in the fulfillment of that duty, the Commission had jurisdiction to hear the case. *Id.* Therefore, if a State employee assumes a duty to control a situation and is negligent, the Claims Commission may assume jurisdiction. *Id.* at 793.

In its answer to Mother's complaint, the State asserted the affirmative defense that

[t]he Claims Commission does not have subject matter jurisdiction over this claim. Specifically, the claim does not fall within any of the categories enumerated at Tenn. Code Ann. § 9-8-307(a)(1) conferring jurisdiction in the Claims Commission.

The State maintains that Carlyle was not in DCS's care, custody, or control at the time of the alleged negligence. Rather, according to the State, Carlyle was in the legal and physical custody of a relative – his aunt, Mrs. Crook – and she was responsible for his care and control. The State also asserted that "[t]o the extent that the state employees relied upon the orders of the juvenile court which reviewed the case and approved the placement of the minor with Lolitha Cook, the state is entitled to quasi-judicial immunity.[7] Tenn. Code Ann. § 9-8-307(d)." The State contends that it was the juvenile court that placed legal and physical custody of Carlyle with Mrs. Crook's household – not DCS.

In this case, the State relies on holdings in *Draper v. State*, No. E2002-02722-COA-R3-CV, 2003 WL 22092544 (Tenn. Ct. App. E.S., Sept. 4, 2003) (no application for permission to appeal filed) and *Holloway v. State*, No. W2005-01520-COA-R3-CV, 2006 WL 265101 (Tenn. Ct. App. M.S., Feb. 3, 2006) (permission to appeal granted - Tenn. Aug. 21, 2006).[8] In those cases, there was no proof or allegation that the State had taken the child into its custody, care, and control. The substance of the complaints in those cases was that the State *should have* removed the child and placed it in State custody. Under those facts, this court found that there is no jurisdiction under T.C.A. § 9-8-307(a)(1)(E) when there is no showing of control, care, or custody of any person that was exercised negligently:

[P]laintiff's interpretation of the statute does not comport with the language adopted by the Legislature. While plaintiff relies upon the construction utilized in *Stewart*, the *Stewart* Court concentrated mainly on the issue of whether there could be state control of a person without that person actually being in the care and custody of the state. But the Court said, if the state trooper in *Stewart* has a legal duty to control the deputies at the scene, or if he voluntarily assumed such a duty, and was negligent in the exercise of that control of persons, then the state could be liable (but the court ultimately found that no such duty existed.). *Id.* There is no similarity between this limited factual scenario which the *Stewart* Court entertained and this case, because

_____

[7]The order of the juvenile court is not of record.

[8]Although permission to appeal was granted, the appeal was subsequently dismissed after claimant filed a motion for voluntary dismissal reflecting that the parties had reached a settlement.

there has been no showing of control, or care, or custody of any person that was exercised negligently.

*Draper*, 2002 WL 22092544, at *3.

The plaintiff in *Draper* filed a claim for the wrongful death of a minor child, contending that the failure of a DCS employee to remove the child from a home led to the child's death. *Id.* The plaintiff also insisted that the State should be held liable for negligently failing to take the child into state care and/or custody, based upon the statutory obligation to protect abused children. *Id.* This court agreed with the finding of the Claims Commissioner that there was a lack of subject matter jurisdiction under T.C.A. § 9-8-307(a)(1)(E) to review the State's failure to remove the child or to take the child into custody:

> We agree with the Commissioner in the instant case that there is neither allegation nor proof that the deceased child in this case was ever in the care, custody and control of the State. To the contrary, Appellant's action is premised on the failure of the State to take care, custody and control of the minor decedent.

The *Draper* Court also concluded that to the extent that the plaintiff alleged there was liability because the State has a statutory duty to protect abused children, there was no jurisdiction under T.C.A. §9-8-307(a)(1)(N), relative to negligent deprivation of statutory rights, because the statute dealing with removal of abused children does not grant a private right of action for the State's negligent failure to remove.

In *Holloway,* a T.C.A. § 9-8-307(a)(1)(E) claim was filed against the State by a minor-decedent's father alleging that DCS failed to properly investigate several referrals and to take appropriate action to prevent abuse by the mother which led to a child's death. The Claims Commission found that the State did not have care, custody, and control of the minor and, thus, that it lacked jurisdiction to hear the claims. *Id.* On appeal, the plaintiff argued that the State had a statutory duty to conduct a proper investigation regarding a referral concerning his son and was negligent in the fulfillment of that duty. *Id.* at *5. The *Holloway* court held as follows:

> In *Draper*, as in the case at bar, there was no proof nor allegation that the State had taken the child into its custody care and control. The substance of the complaint was that the State should have done so. This Court not only noted that there was not a grant of proper right of action for the State's failure to remove, but also found that the statute does not confer jurisdiction under Tenn. Code Ann. § 9-8-307(a)(1)(E) when the child was not taken into custody by the State.
>
> We agree with the Commissioner in the instant case that there is neither allegation nor proof that the deceased child in this case was ever in the care, custody and control

of the State. To the contrary, Appellant's action is premised on the failure of the State to take care, custody and control of the minor decedent.

*Id.* at *4. The State therefore contends that because Carlyle was in the custody of a relative and not in foster care, the reasoning utilized by the courts in *Draper* and *Holloway* applies in this case as well.

In this case, unlike *Draper* and *Holloway*, there is a period of time that the State had taken custody of the child. When Carlyle was initially removed from Mother's home by DCS, he was clearly in the care, custody, and control of the State. In T.C.A. § 37-2-402 (5), "foster care" is defined as

> the temporary placement of a child in the custody of the department of children's services or any . . . home, whether public or private, for care outside the home of a parent or relative (by blood or marriage) of the child, whether such placement is by court order, voluntary placement agreement, surrender of parental rights or otherwise. . . .

The one claim of Mother's that falls within this time frame is the contention that DCS was negligent in its investigation of the Crook home prior to Carlyle's placement there. In its Judgment, the Claims Commission held, in pertinent part, as follows:

> Ms. Mullins contends that DCS was negligent in that no interview or evaluation of Latara Williams was conducted to determine whether she posed a danger to the children prior to DCS's recommendation to the juvenile court that they be placed in the Crook home. Defendant argues that DCS is entitled to quasi-judicial immunity with respect to its recommendations to a court relative to a child's custody placement, since it performs an essential role in the custody proceedings.
>
> * * *
>
> Social workers acting in an advisory role to a juvenile court are entitled to quasi-judicial immunity. *Rippy v. Hattaway*, 270 F.3d 416 (6th Cir. 2001), *cert. denied*, 537 U.S. 812, 123 S.Ct. 72, 154 L.Ed.2d 15 (2002). In *Rippy*, the Court considered whether social[] workers charged with making a recommendation to a juvenile court as to whether a child who has been committed to DCS was ready to return home are entitled to quasi-judicial immunity. Equating the role of a social worker making a recommendation to a juvenile court to a probation officer making a sentencing, the *Rippy* Court noted that:
>
> > The function of making such recommendations, including the underlying investigation, is similarly intimately related to the judicial

-11-

> phase of the child custody proceedings. Social workers involved in the investigation or recommendation are, therefore, entitled to absolute immunity with respect to claims arising from such recommendations and investigations.

*Rippy v. Hattaway*, 270 F.3d 416, 422-423. Like *Rippy*, the proof here is that the ultimate decision of where to place the Mullins children was the juvenile court's. DCS, however, was required to make a recommendation relative to that placement, and that recommendation and the investigation attendant to the recommendation were intimately tied to the judicial process. Therefore, the State, which may raise this immunity pursuant to Tenn. Code Ann. § 9-8-307(d), has quasi-judicial immunity.

Even if DCS employees are not entitled to absolute immunity for acts taken in connection with the recommendation to the juvenile court to place the Mullins children in the Crook home, the Commission finds the evidence does not preponderate in favor of a finding of negligence as to this issue. The proof demonstrated that DCS conducted the required criminal and background investigation and met with all of the interested parties, including Ms. Mullins, Ms. Crook and Latara Williams. There is no evidence that Ms. Williams had any previous history of abusive or assaultive behavior that would have been uncovered by a more thorough investigation. Although Ms. Mullins stated in her referral on May 17, 2005, that Williams had been in special education classes and that she had the maturity level of a thirteen year old, there is no proof before the Commission that further investigation would have revealed these claims to be accurate or whether in fact they were accurate. Nor is [it] clear that either fact would render it more likely that Williams would have abused or assaulted Carlyle Mullins.

The proof established that Ms. Crook's home was considered as a placement at Ms. Mullins['] request. Ms. Mullins wanted the children to be placed with her aunt, despite the fact that she knew Latara Williams and knew that she lived with her aunt. None of the other parties at the TDM voiced any concerns relative to Williams. Based upon the facts submitted at trial, the Commission cannot conclude that Ms. Mullins sustained her burden of demonstrating that DCS's conduct with respect to its recommendation of the Crook household fell beneath the standard of care, such that it breached the duty that it owed claimant's son.

Despite the fact that she ultimately concluded erroneously that the Commission lacked jurisdiction to rule on this claim, the evidence does not preponderate against the findings of the Commissioner. The Court of Appeals may affirm a judgment on different grounds than those relied upon by the trial court when the trial court reached the correct result. *In re Estate of Jones*, 183 S.W.3d 372, 378 n. 4 (Tenn. Ct. App. 2005).

T.C.A. § 37-2-402 further notes as follows:

Foster care shall cease at such time as the child is placed with an individual or individuals for the purpose of the child's adoption by the individual or individuals or at such time as a petition to adopt is filed, whichever occurs first, or at such time as the child is returned to or placed in the care of a parent or relative.

(Emphasis added.). By this definition, upon the juvenile court's placement of Carlyle with Mrs. Crook -- a relative -- he left foster care and the care, custody, and control of the State at that time. Because Carlyle was no longer in the care, custody, and control of the State after he was placed with his relative, Mrs. Crook, the holdings in *Draper* and *Holloway* -- relating to situations where DCS has been called to the home of a parent or relative upon a referral -- are applicable as to Mother's remaining claims. Accordingly, the Claims Commission had no subject matter jurisdiction over those claims. The Commissioner noted as follows:

The proof showed that Carlyle Mullins had been placed in the custody of Lolitha Crook by the juvenile court and DCS had closed its file and ended its involvement in the matter at that time. As in *Draper*, *supra*, Carlyle was not in the care or custody of the State at the time of the alleged negligent failure to investigate the abuse or to remove him from the Crook home. There was no proof that DCS had any continuing supervisory duty with respect to Ms. Crook's custody.

Ms. Mullins argues, however, relying on *Stewart v. State*, *supra*, that Hall had a statutory duty to properly investigate abuse and to protect the child when abuse is disclosed. In *Stewart*, the Court held that under section 9-8-307(a)(1)(E), "care, custody, and control" is not limited to persons confined in institutions maintained by the State, but rather may also include a person whom a State official has a legal duty to control, even if the person is not actually within the control of the State official at the time of the incident. *Stewart*, 33 S.W.3d at 792. This argument, however, appears to be identical to the one rejected by the Court of Appeals in *Draper*, where the Court noted:

While plaintiff relies upon the construction utilized in *Stewart*, the *Stewart* Court concentrated mainly on the issue of whether there could be state control of a person without that person actually being [in] the care and custody of the state. But the Court said, if the state trooper in *Stewart* had a legal duty to control the deputies at the scene, or if he voluntarily assumed such a duty, and was negligent in the exercise of the control of persons, then the state could be liable (but the court ultimately found that no such duty existed.). *Id.* There is no similarity between this limited factual scenario which the *Stewart* Court entertained and this case, because there has been no

-13-

showing of control, or care or custody of any person that was exercised negligently.

*Draper v. State*, 2. Furthermore, the *Draper* Court determined, an argument that the state owed and breached a duty to protect a child under the child abuse statutes, is essentially a claim for negligent deprivation of a statutory right, Tenn. Code Ann. § 9-8-307(a)(1)(N). That statute, however requires "that the general assembly expressly conferred a private right of action in favor of the claimant against the state for the state's violation of the particular statute's provisions[.]" Tenn. Code Ann. § 9-8-307(a)(1)(N) (emphasis added). Because Ms. Mullins has not identified a private right of action expressly conferred upon her for the State's violation of [t]his statute, there is no subject matter jurisdiction under this provision.

Additionally, prior to trial, in an order denying the State's motion to dismiss, the Claims Commissioner observed that while Mother had cited no statute, rule, or policy with respect to her claim that DCS had a duty to supervise temporary placements for the juvenile court, the State had not directly addressed whether it has such a duty. Thus, the Commissioner found that a duty to supervise the temporary placement, if established, could constitute control within the meaning of *Stewart* and T.C.A. § 9-8-307(a)(1)(E). In that order, however, the Commissioner specifically ruled that Ms. Hall, when she investigated the referral on May 17, 2005, had not voluntarily undertaken to act where she had no responsibility and that she could not be deemed to have assumed a duty. In the final judgment, the Commissioner ruled as follows:

> Ms. Mullins also distinguishes this claim on the basis that Ms. Hall *assumed* the duty to act and protect the child. The evidence relied upon for this assertion is Ms. Hall's testimony that she *knew and understood* that she had a responsibility to protect Carlyle Mullins and further that it was her *intent* to protect him when she came to the home on May 17, 2005.
>
> Ms. Hall did not in fact remove Carlyle Mullins from custody and testified that she personally lacked the authority to remove the child. While one who affirmatively acts, even though not required to, may be required to exercise due care, Ms. Hall's subjective thoughts and intentions are insufficient bases for concluding that she assumed a duty to act or that liability should ensue from its breach. Based upon the decisions in *Draper* and *Holloway*, the Commission concludes that claimant's allegation that DCS was negligent in its care, custody and control of Carlyle Mullins because it failed to insure that he was not being subjected to abuse in the Crook home is not within its subject matter jurisdiction.

We conclude that the evidence does not preponderate against the findings of the Claims Commissioner that she lacked subject matter jurisdiction to consider Mother's remaining claims.

-14-

# NEGLIGENCE

Even though the Commissioner held that the Claims Commission did not have jurisdiction to hear Mother's claims, a finding was made that negligence on the part of DCS had not been established. The Commissioner noted as follows:

[E]ven assuming that the allegations made here came within the Commission's jurisdiction, Ms. Mullins must still prove that DCS's negligence was the proximate cause and cause in fact of the injuries alleged. It is well settled that "proof of negligence without proof of causation is nothing." *Mosley v. Metropolitan Government of Nashville and Davidson County*, 155 S.W.3d 119 (Tenn. Ct. App. 2004). "A negligence claim requires proof of two types of causation: causation in fact and proximate cause." *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005). Both must be proven by the plaintiff by a preponderance of the evidence." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). If testimony in a lawsuit leaves a determinative fact unresolved, then the evidence does not preponderate. *See Reserve Life Ins. Co. v. Whittemore*, 442 S.W.2d 266, 275 (Tenn. Ct. App. 1969).

Thus, Ms. Mullins bears the burden of proving that the negligence alleged -- the failure to fully investigate the referral received from Ms. Mullins on May 17, 2005 -- was the cause in fact and proximate cause of the injuries alleged. These are different inquiries. Cause in fact requires a determination of the cause and effect relationship between the defendant's breach of the duty of care and the plaintiff's injury. "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." *Willis v. Settle*, 162 S.W.3d 169 (Tenn. Ct. App. 2004), citing *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993).

In order to be considered a cause in fact of an injury, the defendant's conduct must be shown to have been a "necessary antecedent" to the plaintiff's injury. *Waste Management, Inc. of Tennessee v. South Central Bell Telephone Co.*, 15 S.W.3d 425, 432 (Tenn. Ct. App. 1997). Tennessee's courts have consistently recognized that conduct cannot be a cause in fact of an injury when the injury would have occurred even if the conduct had not taken place. *Id.* at 430-431.

In addition to showing that the defendant's conduct was the cause in fact of his injury, a plaintiff must also prove that his injuries were proximately caused by the defendant's conduct. In Tennessee, there is a three-pronged test for proximate causation: (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence. *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). Thus,

proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. *Bennett v. Putnam County*, 47 S.W.3d 438, 443 (Tenn. Ct. App. 2000).

Ms. Mullins relies upon the IAD Investigative report and the concerns and violations of department rules and regulations identified in that report as proof of negligence. Thus, a finding of liability on the part of the State must necessarily rest upon a finding that had there been no rule violations, Carlyle Mullins' death would not have occurred. The facts, however, do not support this conclusion.

There are a number of facts, which although sad and disturbing, must be considered. First, Carlyle Mullins was removed from an abusive home in which he lived with a drug-addicted mother and two siblings on April 18, 2005, and was taken into foster care. There was at least one prior unconfirmed report of physical abuse while he was in his mother's care known to DCS. At his mother['s] request, Carlyle was placed in the custody of an aunt, Lolitha Crook, on April 20, 2005. He remained there until he was admitted to Vanderbilt on May 26, 2005, having been subjected to fatal abuse at the Crook home.

There is no documented record of any wounds or scars that Carlyle Mullins may have had at the time of his placement with Ms. Crook. Ms. Mullins denies that he had any marks when he was removed from her custody. However, Ms. Mullins' role as claimant in this matter and the fact that a contrary response would have been personally incriminating casts doubt on her credibility as to this issue. The Commission considers the question unresolved.

At some point prior to his death, Carlyle received what appeared to be a bite mark on his lower back. The autopsy report contains the following references to a bite mark: "Human bite mark on the left lower back." Autopsy Report, p.2. "The left side of the lower back shows multiple abrasions in the pattern of a bite mark." Autopsy Report, p. 3. "The skin of the back showed a patterned abrasion consistent with a bite mark."

No information is contained in the report concerning the probable length of time that the mark had been present or when it was made. No proof was offered that would identify the person who inflicted the bite. There is no proof that Latara Williams caused the bite marks.

Similarly, the Autopsy Report also reflects that Carlyle had a number of hypopigmented healing scars on his body, which the medical examiner concluded appeared to be healing burns. There is no information as to how or when the wounds were made. Claimant offered no proof that the marks were caused by Latara Williams.

Claimant's argument asks the Commission to assume that had Ms. Hall's investigation been free of the errors identified in the IAD Report, Carlyle would have been removed from the home. The IAD report reflects that Ms. Hall failed to carry out required investigative tasks and to corroborate or refute all of the allegations raised in the referral. Those allegations were: that Latara Williams was mentally incapable of caring for three small children while Lolitha Crook was absent from the home at work, completing an internship and attending foster care classes; that Latara had been in special education classes, had the maturity level of a thirteen year old, and had burned up the kitchen.

Aside from Ms. Hall's note reflecting her observation that Williams may have been "mentally delayed," and Ms. Mullins' statements that Williams had been in special education and "had the maturity of a thirteen year old," little evidence was offered at trial about Williams other than her arrest for first degree murder and aggravated child abuse subsequent to Carlyle Mullins' death. No evidence was offered concerning the issues raised in the IAD report, namely, whether Williams' mental capacity was sufficient to permit her to care for three small children. Because there is no proof concerning her placement in special education classes, CPR certification, or whether she was in any way unqualified to care for the Mullins children, the Commission cannot say that further investigation into these facts would have resulted in the decision to remove them. Moreover, the relationship between some of these fact[s] and Carlyle[] Mullins' injuries is not immediately apparent. There was no evidence offered that Williams' placement in special education, her lack of CPR certification or lifeguard qualifications would make it more likely that she would subject Carlyle to blunt trauma sufficient to cause his death.

Similarly, although Ms. Hall admitted that she did not examine or interview Carlyle's older brother M.M., there is no proof that had she done so she would have determined that M.M. was also being abused or that he had knowledge of any abuse of Carlyle. Ms. Mullins bears the burden of proving causation by a preponderance of the evidence. Because there is only speculative proof that Carlyle Mullins would not have been abused but for Ms. Hall's negligence with respect to the investigation of Ms. Mullins' referral, the Commission cannot conclude that any negligence by the State was sufficiently causally related to his injuries to impose liability for his unfortunate death.

* * *

(Footnotes omitted).

When the State is accused of negligence under T.C.A. § 9-8-307(a)(1)(E), its liability is based on the traditional tort concepts of duty and "the reasonably prudent person's standard of care."

T.C.A. § 9-8-307(c). Under Tennessee law, in order to recover under a theory of common law negligence, a plaintiff must establish the following elements:

> (1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, cause.

*McClenahan v. Cooley,* 806 S.W.2d 767, 774 (Tenn. 1991).

The State argues that it cannot be shown that the alleged negligence of DCS was the proximate cause of Carlyle's death. According to the State, Mother cannot establish that an immediate risk of harm -- necessary for the emergency removal -- would have been revealed if Ms. Hall or DCS had conducted a better interview and more comprehensive investigation. The State notes that while it is undisputed that DCS found Ms. Hall's actions in this matter to be unsatisfactory, those findings, standing alone, do not prove that DCS was negligent.

Upon careful review of the record and the applicable law, we are persuaded that even if subject matter jurisdiction existed in regard to these claims, there could be no recovery as a matter of law. The proximate cause of the death was apparently the actions of Ms. Williams, as opposed to anything that the State may or may not have done. While, theoretically, an argument could be made that the actions of DCS were, to some extent, responsible for Carlyle's death,

> the rule is that where two distinct causes, unrelated in operation, one of them being the "direct cause" and the other furnishing the condition by which the injury was made possible, the former alone is to be regarded as the proximate cause of the result.

*Ward v. Univ. of the South*, 354 S.W.2d 246, 251 (Tenn. 1962). Thus, even assuming that the actions of DCS were unsatisfactory, such actions were not the legal cause of Carlyle's death.

## V. CONCLUSION

With the exception of the claim concerning the investigation of the placement of the child in the Crook home -- an event that occurred during the period of time that Carlyle was within the care, custody, and control of the State -- we conclude that the evidence does not preponderate against the findings of the Commissioner. On that claim, however, the Commissioner arrived at the proper result. Accordingly, the decision of the Claims Commission is affirmed as modified. Costs on appeal are taxed to the Appellant, Candace Mullins. This case is remanded to the Claims Commission for further proceedings, pursuant to applicable law.

_____
JOHN W. McCLARTY, JUDGE