IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 17, 2021 Session

## ALL ACCESS COACH LEASING, LLC v. JEFF MCCORD, COMMISSIONER OF LABOR AND WORKFORCE DEVELOPMENT, STATE OF TENNESSEE

**Appeal from the Chancery Court for Davidson County**
**No. 19-377-II        Anne C. Martin, Chancellor**

_____

**No. M2020-01368-COA-R3-CV**

_____

An agency determined that a tour bus leasing company mischaracterized its tour bus drivers as independent contractors rather than employees, for the purposes of unemployment taxes. The company sought review in chancery court, which affirmed the agency's determination. Because there is substantial and material evidence to support the agency's determination, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

Brett R. Carter, Nashville, Tennessee, for the appellant, All Access Coach Leasing, LLC.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Kristen Kyle-Castelli, Senior Counsel, for the appellee, Tennessee Dept. of Labor and Workforce Development.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

All Access Coach Leasing, LLC ("Appellant") is a tour bus leasing company that rents buses to music entertainers ("clients" or "tours"). Appellant maintains a pool of drivers that it can call on when a client leases a bus and needs a driver. If the client already has his or her own driver, the driver still has to qualify through Appellant to drive, pursuant

to federal safety regulations. Some drivers are assigned to specific buses and get the first opportunity to drive for tours that lease those buses. The drivers are free to decline offers for work from Appellant and to work for other companies. Appellant either bills clients for the drivers' services or clients pay the drivers directly. Drivers have to carry their own tools for minor maintenance, though it appears that Appellant bears the responsibility of addressing more major maintenance issues. Drivers coordinate routes and other location details with the tours directly. They primarily coordinate and communicate only with the tours once they take the bus off Appellant's property, unless, for example, there is a major maintenance issue.

Appellant provides drivers with 1099 tax forms and does not pay for drivers' meals or lodging costs unless they are a product of a bus breakdown. Procedures that drivers are required to follow, both under the law and Appellant's own policies, are outlined in a driver's handbook created by Appellant ("the handbook") and provided to the drivers. According to one of the drivers, it is a Department of Transportation ("DOT") requirement for drivers to carry an annual driver's manual. The procedures drivers need to follow include completing a pre-trip inspection of the bus; stocking the bus with supplies before departure, which Appellant does not reimburse drivers for but the clients might; and completing a post-trip checklist upon return from tour, including noting mechanical work the bus needs. Some of these tasks are completed on Appellant's premises.

The Tennessee Department of Labor and Workforce Development ("the Department")[1] conducted a payroll audit of Appellant, determining in February 2018 that Appellant had misclassified the drivers of its buses as independent contractors in 2015, 2016, and the first two quarters of 2017. The determination was based on certain payroll reporting requirements under the Tennessee Employment Security Law, Tenn. Code Ann. §§ 50-7-101 *et seq.* (the "Security Law"), and corresponding rules and regulations. Consequently, the Department assessed $13,792.85 against Appellant in unpaid taxes, plus interest. Appellant submitted a request for review and redetermination to the Director of Employer Accounts Operations for the Department.

The redetermination decision found that five cleaners who provided services to Appellant were not employees.[2] As to the bus drivers, the redetermination affirmed the original decision. The redetermination decision explained, *inter alia,* that the drivers were employees under both the common law test, referenced in section 50-7-207(b)(2)(B) of the Security Law, and the so-called "ABC test," contained in section 50-7-207(e), as explained further *infra*.

---

[1] For ease of reference, we have at times treated the Department and its subdivisions as interchangeable throughout this Opinion, therefore referring to them as simply "the Department."

[2] The classification of these five workers is not at issue in this appeal.

- 2 -

Appellant appealed the redetermination decision to the Appeals Tribunal ("the Tribunal"). An appeal hearing in front of a Hearing Officer was held on October 24, 2018. At the hearing, the following people testified for Appellant: Eric Blankenship, co-owner of Appellant; Luke McKnight, who had been driving for Appellant for seven years; Paul Grant, who had been driving for Appellant for eleven years; and Charlie Sherman, who drives buses for Appellant and other companies. Hugh Howell, a bus driver who had worked with Appellant for fifteen years, and Trenton Hitchens, who worked as a driver for Appellant from September 2014 through February 2016, testified for the Department.[3]

Mr. Blankenship testified, *inter alia*, that the drivers are responsible for ensuring the validity of some of their own qualifications, including their licenses. He explained that Appellant provides information on the applicable federal law to drivers at an annual safety meeting for all drivers that is required by the DOT. However, Mr. Hitchens testified that the annual meeting was not technically mandatory, but if a driver did not attend he would usually not get work. And Mr. Sherman testified, *inter alia*, that he had only been able to attend one of the annual safety meetings. Additionally, Mr. Blankenship testified that Appellant provides gifts and bonuses to the drivers at the annual meetings. Mr. McKnight and Mr. Hitchens corroborated this, with Mr. Hitchens testifying that he received separate 1099's for the gifts. Mr. Howell also testified that awards were handed out at the annual meetings. In contrast, Mr. Grant testified, *inter alia*, that Appellant did not hand out gifts or bonuses at the annual meetings.

Mr. Blankenship further testified that the drivers' daily rate is set at the annual meeting between drivers and Appellant, or, alternatively, drivers can negotiate annual salaries with clients. Some of the drivers testified that they can otherwise negotiate their pay directly with tours. Mr. Blankenship also stated that drivers have discretion to charge additional fees, such as a fee for towing a trailer behind the bus. Mr. Howell, on the other hand, testified that Appellant has a standard daily pay rate it sets for drivers of $400.00 per day, with $30.00 extra if they have to pull a trailer, and he did not remember conversations about setting pay rates at the annual meetings.

Mr. Blankenship also claimed that Appellant is not involved in replacing drivers unless a client requests a new driver, in which case the first driver is responsible for the cost of his replacement. However, Mr. Howell answered affirmatively when asked if Appellant could remove and replace him if Appellant thought he was not performing his duties satisfactorily, though he seemed to think the only reason something like that would happen is if a tour complained. Similarly, Mr. Hitchens testified, *inter alia*, that Appellant had the power to replace drivers if it felt they were not performing duties as expected, and he was replaced and also replaced other drivers himself on some occasions. He said that on one occasion, Appellant replaced him with another driver, unbeknownst to the tour he was

---

[3] Some witnesses testified in person and others testified over the phone. Parts of the transcript are difficult to understand, including several portions marked "(inaudible)."

driving for, because he questioned Appellant's failure to fulfill its responsibility to test-drive buses after they had major mechanical work done.

Mr. Howell further testified, *inter alia*, that he considers himself as owning and operating his own independently established business and possesses a business license (but it is not clear if he was referring to his driving for Appellant or to the other, unrelated businesses that he operates). He also stated that Appellant does not carry liability insurance on him and, to his knowledge, worker's compensation is not available to him. When asked if he signed an independent contracting agreement when he first started working for Appellant, Mr. Howell stated that he was not sure, but he thought that he did. On the other hand, Mr. Hitchens did not consider himself as owning or operating his own business and did not advertise his bus driving services to the general public. Additionally, Mr. McKnight testified, *inter alia*, that he started an S-corporation through which his wages are run, in order to limit his liability. And Mr. Grant answered no when asked if Appellant provides him with business cards.

Mr. Sherman estimated that he had driven "65 percent for [Appellant] and 45 [percent]" of his time for other companies that year. Mr. Howell testified that he drives approximately at least half of the time for Appellant compared to other companies. Mr. Hitchens stated that, prior to being replaced, he only drove for Appellant, and that Appellant "didn't want their drivers working for anybody but [Appellant]."

The Tribunal Hearing Officer reversed the redetermination decision, finding that Appellant's workers are not employees under either the common law or ABC tests. The Department appealed the Tribunal's decision to the Department's Office of Administrative Review. The Commissioner of Labor and Workforce Development's Designee ("the Designee") rendered a decision on the appeal, reversing the Tribunal's decision in an order dated February 1, 2019 and finding that the drivers are employees under the common law test and the ABC test.

In March 2019, Appellant petitioned for judicial review of the Designee's determination that Appellant's drivers are employees in the Davidson County Chancery Court ("the trial court"). The Department filed an answer,[4] and there was a hearing in the trial court on August 18, 2020. After considering the pleadings, the record, and argument of counsel, the trial court affirmed the Designee's decision, agreeing that the drivers are Appellant's employees under both the common law and ABC tests, and finding that the Designee's findings did not violate the law, were not arbitrary, capricious, or an abuse of discretion, and were supported by substantial and material evidence. Appellant appealed.

### ISSUES PRESENTED

---

[4] The Department raised an affirmative defense in its answer under Rule 12.02(6) of the Tennessee Rules of Civil Procedure. Neither party mentions that on appeal, and so we will not address it.

Appellant raises the following issues for review, taken from its brief:

I. Whether the procedures set forth in Tenn. Code Ann. § 50-7-304 violate the Due Process Clause of the U.S. Constitution as applied to Appellant?

II. Whether the Trial Court failed to apply the binding precedent in this case as set forth in *HRP of Tennessee, Inc. v. State, Department of Employment Security*, No E2005-01176-COA-R3-CV[, 2006 WL 1763673] (Tenn. App. June 28, 2006)?

III. Whether the bus drivers at issue in this case are independent contractors under Tennessee unemployment tax law?

Appellee raises the following issues for review, taken from its brief:

I. Whether the administrative decision classifying [Appellant's] drivers as employees should be affirmed under Tenn. Code Ann. § 50-7-304(i) because it is not in violation of statutory provisions, is supported by substantial and material evidence, and is not arbitrary and capricious.

II. Whether [Appellant] waived its constitutional challenge to Tenn. Code Ann. § 50-7-304(e), when it failed to raise such a challenge in the trial court.

### DISCUSSION

### I.

Appellant first argues that Tennessee Code Annotated section 50-7-304 is unconstitutional. Specifically, Appellant contends that the procedure whereby a single appointed Designee may unilaterally overturn the Tribunal's findings violates due process because it deprives taxpayers of a fair hearing before an impartial tribunal. In addition to arguing that the statute is constitutional, the Department also argues that Appellant waived this argument because it was not raised in the trial court.

Generally, "[i]ssues not raised in the trial court cannot be raised for the first time on appeal." *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006) (citing *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991)). Thus, even a constitutional attack on the validity of a statute may not be entertained on appeal when not first raised in the trial court, except where the statute is "so obviously unconstitutional on its face as to obviate the necessity for any discussion." *City of Memphis v. Shelby Cty.*, 469 S.W.3d 531, 560 (Tenn. Ct. App. 2015) ("It has long been the general rule that questions not raised in the trial court will not be entertained on appeal, and this rule also

applies to an attempt to make a constitutional attack on the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion."). Moreover, the Tennessee Supreme Court has indicated that waiver may occur where constitutional arguments in the trial court are "minimally addressed[.]" *Id.* (citations and internal quotation marks omitted) ("[T]he City's constitutional challenge was late-raised [and] minimally addressed. To now rely upon the importance of this issue as grounds for appellate review is near hypocrisy given the short shrift it received at trial where it could have, and should have, been fully adjudicated."); *cf. Yebuah v. Ctr. for Urological Treatment, PLC*, 624 S.W.3d 481, 491 (Tenn. 2021) (internal citation omitted) ("[I]n their brief [the appellees] merely mention potential 'constitutional problems' without properly explaining or giving adequate legal support for such claims. Thus, we deem these issues to be waived.").

Finally, we note that the procedure for filing a petition for judicial review under the Security Law contains something of a specificity requirement. In particular, Tennessee Code Annotated section 50-7-304(i)(1) provides that the petition for review "shall *distinctly* state the grounds upon which the review is sought[.]" This requirement is reiterated in subsection (i)(4), which provides that "the petition shall *distinctly* state the grounds upon which the action of the commissioner's designee is deemed erroneous." With some well-settled exceptions, the use of the word "shall" generally indicates that an action is mandatory. *See Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 144 (Tenn. 2017) ("In general, use of the word "shall" in a statute indicates that the statutory provision is mandatory, not discretionary."). And the word "distinctly" is the adverbial form of a word defined as, *inter alia*, "well-defined, unmistakable, definite[.]" *Webster's New World College Dictionary* 426 (5th ed. 2014) (defining "distinct"); *see also Garner's Dictionary of Legal Usage* 288 (3rd ed. 2011) (defining "distinct" as "well-defined, discernable, separate"). Thus, Appellant's petition must have distinctly raised any constitutional challenge in order for it to have been properly raised in the trial court.

Following our review of the record, we conclude that this issue was not properly raised. As an initial matter, we can find nothing in the record showing that Appellant raised this issue at the administrative level. While this failure may only be fatal to an "as-applied" challenge, we conclude that Appellant also failed to properly raise its constitutional challenge in the trial court. *See generally Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 846 (Tenn. 2008) ("Questions of whether the *application* of a statute violates constitutional principles should be submitted to the agency through a petition for a declaratory order before any action is brought in the Chancery Court. Questions of constitutional *validity* need not be.") (internal citation omitted). To start, we begin with Appellant's petition for judicial review in which Appellant stated, in part, the following:

> To the extent that the Determinations of the Commissioner and the Commissioner's designee are otherwise contrary to the applicable Tennessee employment security law statutes, the Tennessee Constitution, or the United

- 6 -

States Constitution, the assessment and determinations of the Respondent are erroneous, unjust, illegal, invalid, and contrary to Tennessee law and should be rejected and overturned.

While Appellant made a passing reference to constitutional issues in its petition, it did not develop the issue any further, including specifying in what ways the Department's actions or the statute at issue were unconstitutional. For example, while Appellant now argues that the proceedings lacked an impartial tribunal in violation of due process, neither the appointment of the Designee nor the doctrine of due process is even mentioned in Appellant's petition. Moreover, the petition states that the Department's determinations may be unconstitutional, not section 50-7-304 itself. Respectfully, Appellant's petition makes nothing more than a vague reference to questions of constitutionality. Appellant therefore only minimally addressed any constitutional challenge in its petition and consequently did not meet the specificity requirements of section 50-7-304(i). Tenn. Code Ann. §§ 50-7-304(i)(1) & (4); *City of Memphis v. Shelby Cty.*, 469 S.W.3d at 560. This is not sufficient to raise the issue for purposes of appellate review.

In its reply brief, however, Appellant asserts that no waiver occurred in this case because some form of constitutional allegations were included in its petition and the trial court specifically ruled on that challenge, stating in its final ruling that "the Designee's findings . . . did not violate constitutional or statutory provisions [.]" Respectfully, we disagree. Assuming, *arguendo*, that Appellant raised its constitutional challenge despite not detailing that error distinctly in its petition, we conclude that the trial court's order does not indicate that any specific constitutional challenge was in fact raised in or adjudicated by the trial court. In particular, the trial court's above ruling regarding constitutionality appears to be nothing more than a parroting of the applicable standard of review. Certainly, this finding does not indicate that the specific constitutional challenge raised in this appeal—a due process challenge to the appointment of a single Designee—was raised in the trial court.

Even more importantly, the trial court's own recitation of the arguments presented to it belies Appellant's argument on appeal:

On behalf of its Petition for Judicial Review, [Appellant] presented three arguments to this Court: (1) The Designee misstated the applicable standard blurring the lines between factual findings and application of law; (2) The Designee misapplied the common law rules to these facts; and (3) The Designee misapplied the ABC test to these facts. [Appellant] emphasized that the facts are the most important element in these cases, and the Court agrees.

A constitutional challenge is simply not among the arguments that the trial court found were presented to it.

To the extent that Appellant now asserts that the above finding is incorrect, it has not presented us with a proper record to overturn the trial court's finding. Specifically, there is no transcript from the trial court hearing in the record on appeal. In that situation, we generally "assume that the record, had it been preserved, would have contained sufficient evidence to support the trial court's factual findings." *Aibangbee v. Aibangbee*, No. M2005-02598-COA-R3-CV, 2007 WL 1202409, at *2 (Tenn. Ct. App. Apr. 20, 2007) (citations omitted). Without a transcript or statement of the evidence, we must assume that the trial court's finding that only three arguments were made to it, none of which involved the constitutional question now presented to this Court, is correct.

Finally, this is not one of those situations where the constitutionality of a statute may be raised for the first time on appeal because the statute is so obviously facially unconstitutional. *Cf. City of Elizabethton v. Carter Cty.*, 204 Tenn. 452, 463, 321 S.W.2d 822, 827 (1958) (explaining, as an example of a statute that was clearly unconstitutional on its face, one that attempted to establish an inferior court without following the process mandated in Article 6, Sections 1 and 4 of the Tennessee Constitution.); *see also Childress v. State*, No. W2012-02104-CCA-R3-HC, 2013 WL 793211, at *3 (Tenn. Crim. App. Mar. 1, 2013) (holding, without additional analysis, that "[t]hat exclusion is not applicable in this case"). In this case, the question of whether section 50-7-304 is facially unconstitutional involves sometimes murky areas of the law such as due process and agency law. *Cf. Moncier v. Bd. of Prof. Responsibility*, 406 S.W.3d 139, 159 (Tenn. 2013) (stating that agency actions involve "[overlapping] investigative, prosecutorial, and adjudicative functions"); *Heyne v. Metropolitan Nashville Bd. of Public Educ.*, 380 S.W.3d 715, 732 (Tenn. 2012) (holding that due process is a flexible concept that is different depending on the situation). Legal questions that involve overlapping areas of the law and difficult factual questions are rarely so easily decided as to obviate any need for discussion. Given that these areas of the law are implicated, we cannot conclude that section 50-7-304 is so obviously unconstitutional that we can address this issue despite Appellant's waiver. Because Appellant did not raise its challenge to the constitutionality of section 50-7-304 in the trial court, this issue is waived.

## II.

Appellate courts use the same standard of review as trial courts when reviewing a decision by the Department regarding unemployment taxes, as is at issue here. Tenn. Code Ann. § 50-7-304(i)(4) (stating, in pertinent part, "An appeal may be taken from the judgment and decree of the chancery court having jurisdiction of these controversies to the Tennessee [C]ourt of [A]ppeals, in the same manner, but not inconsistent with this chapter, as provided in other civil cases."); *cf. Ridley v. Neeley*, No. E2010-00289-COA-R3-CV, 2010 WL 4272711, at *3 (Tenn. Ct. App. Oct. 28, 2010) (citing *Armstrong v. Neel*, 725 S.W.2d 953, 955 n.1 (Tenn. Ct. App. 1986)) (stating, in the context of a former employee's potential entitlement to unemployment benefits, "Appellate courts and trial courts are subject to the same standard of review [codified at Tennessee Code Annotated section 50-

7-304(i)(2)–(3)] when reviewing administrative decisions pertaining to unemployment compensation."). The first part of that standard of review reads as follows:

> (2) The chancellor may affirm the decision of the commissioner or the chancellor may reverse, remand or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> > (A) In violation of constitutional or statutory provisions;
> >
> > (B) In excess of the statutory authority of the agency;
> >
> > (C) Made upon unlawful procedure;
> >
> > (D) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> >
> > (E) Unsupported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 50-7-304(i)(2).[5]

Substantial and material evidence "requires something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Gluck v. Civ. Serv. Comm'n*, 15 S.W.3d 486, 490 (Tenn. Ct. App. 1999) (internal parenthetical omitted) (citing *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (1988)) (in the context of the UAPA). Additionally,

> Substantial and material evidence is defined as "'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *Sweet v. State Tech. Inst. at Memphis*, 617 S.W.2d 158, 161 (Tenn. Ct. App. 1981)

---

[5] While prior cases of this Court have applied the judicial review standards of the Uniform Administrative Procedures Act ("UAPA") to cases like this one, *see, e.g.*, *Concord Enterprises of Knoxville, Inc. v. Comm'r of Tennessee Dep't of Lab. & Workforce Dev.*, 524 S.W.3d 233, 236–37 (Tenn. Ct. App. 2017) (citing *HRP of Tennessee*, 2006 WL 1763673, at *2), the proper standard of review, as the parties agree, is contained in section 50-7-304(i)(2) of the Security Law. *See* Tenn. Code Ann. § 4-5-106(e) (stating that the UAPA judicial review procedures contained in sections 4-5-322 and -323 "shall not apply to the department administering the Employment Security Law under title 50, chapter 7."). Nevertheless, the version of the UAPA standard that those cases applied was virtually identical to the standard contained in the Security Law. Only very recently has the UAPA been amended to materially change the standard of review contained in section 4-5-322(h). Neither party asserts that these recent amendments are applicable to this case.

(quoting ***Pace v. Garbage Disposal Dist. of Washington Cnty.***, 390 S.W.2d 461, 463 (Tenn. Ct. App. 1965)). If the record contains such evidence, we must affirm the [administrative body's] decision unless it is contrary to law. ***Perryman v. Bible***, 653 S.W.2d 424, 429 (Tenn. Ct. App. 1983).

***Phillips v. Phillips***, No. E2015-00407-COA-R3-CV, 2015 WL 5882527, at \*4 (Tenn. Ct. App. Oct. 8, 2015). But "the 'substantial and material evidence standard'" still "requires a searching and careful inquiry that subjects the agency's decision to close scrutiny." ***Wayne Cty.***, 756 S.W.2d at 280 (Tenn. Ct. App. 1988) (also in the context of a UAPA case).

And as this Court has previously elaborated in the UAPA context,

[agency] decisions that are not supported by substantial and material evidence are necessarily arbitrary and capricious, as are decisions with adequate evidentiary support that are based on a clear error in judgment. In its broadest sense, the arbitrary and capricious standard in Tenn. Code Ann. § 4-5-322(h)(4)

> requires the court to determine whether the administrative agency has made a clear error in judgment. An arbitrary or capricious decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion.

***Miller v. Civ. Serv. Comm'n of Metro. Gov't of Nashville & Davidson Cty.***, 271 S.W.3d 659, 665 (Tenn. Ct. App. 2008) (citations omitted).

The second part of the applicable standard of review continues as follows:

(3) In determining the substantiality of evidence, the chancellor shall take into account whatever in the record fairly detracts from its weight, but the chancellor shall not substitute the chancellor's judgment for that of the commissioner's designee as to the weight of the evidence on questions of fact. No decision of the commissioner's designee shall be reversed, remanded or modified by the chancellor, unless for errors that affect the merits of the final decision of the commissioner's designee. The petition for judicial review shall be heard by the chancellor either at term time or vacation as a matter of right, any other statute of this state to the contrary notwithstanding.

Tenn. Code Ann. § 50-7-304(i)(3). Therefore, "[a]n agency's findings of fact may not be reviewed *de novo* by the appellate courts, and the latter should not substitute its judgment

for that of the agency." ***Concord Enterprises***, 524 S.W.3d at 236 (quoting ***HRP of Tennessee***, 2006 WL 1763673, at *2). "We are not at liberty to reevaluate the evidence or substitute our judgment for that of the factfinder." *See* ***McClellan v. Bd. of Regents of State Univ.***, 921 S.W.2d 684, 693 (Tenn. 1996) (internal citations omitted) (citing ***Southern Ry. Co. v. State Bd. of Equalization***, 682 S.W.2d 196 (Tenn.1984); ***Humana of Tenn. v. Tennessee Health Facilities Comm'n***, 551 S.W.2d 664 (Tenn.1977)) (in the context of a UAPA case).

"[H]owever, the 'construction of a statute and application of the law to the facts is a question of law that may be addressed by the courts.'" ***Concord Enterprises***, 524 S.W.3d 233 at 236 (quoting ***Sanifill of Tennessee, Inc. v. Tennessee Solid Waste Disposal Control Bd.***, 907 S.W.2d 807, 810). Thus, "[t]he question of whether [a business] is subject to unemployment insurance taxation under relevant statutory authority is determined by an application of the law to the facts and is, accordingly, a question of law." ***Id.*** at 236–37. Still, we have emphasized in the UAPA context that "[t]he courts may [not] substitute their judgment for the [agency's], even if the evidence could support a conclusion different from the one reached by the commission." ***Miller***, 271 S.W.3d at 664 (citing Tenn. Code Ann. § 4-5-322(h)(5)(B)).

Moreover, agencies are entitled to deference in their interpretations of rules, regulations, and statutes that they are charged with administering. *See* ***Jackson Exp., Inc. v. Tennessee Pub. Serv. Comm'n***, 679 S.W.2d 942, 945 (Tenn. 1984) (citations and quotation marks omitted) ("Generally, courts must give great deference and controlling weight to an agency's interpretation of its own rules. A strict standard of review applies in interpreting an administrative regulation, and the administrative interpretation becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."); ***Profill Dev., Inc. v. Dills***, 960 S.W.2d 17, 27 (Tenn. Ct. App. 1997) (citing ***Wayne County***, 756 S.W.2d at 279–280) ("The Court finds that the Department has the knowledge, expertise and experience and is charged with the administration of the technical details of the statute. Accordingly, the Department's decisions concerning the applicability of technical terms of the statute are entitled to deference in the same manner as other technical decisions.").

The Security Law "was enacted for the purpose of supplementing a worker's resources during unemployment." ***Beare Co. v. State***, 814 S.W.2d 715, 717 (Tenn. 1991) (citing ***Balding v. Tennessee Dept. of Emp. Sec.***, 212 Tenn. 517, 370 S.W.2d 546 (Tenn. 1963)). Unemployment benefits are paid out of a program funded by "a tax on employers. Every employer who receives services performed by an employee in his 'employment' as defined in T.C.A. § 50-7-207, is obligated to make contributions to the unemployment compensation fund, unless the services are excluded from coverage under the provisions of T.C.A. § 50-7-207(c)." ***Id.*** Section 50-7-207(a)[6] defines "employment" as follows:

---

[6] References to section 50-7-207 are to the version in effect when the Department issued its first

For purposes of this chapter and subject to the special rules contained in subsection (e), and the definitions contained in subsection (f), "employment" means service that meets all of the following conditions:

(1) It is within any category of "included service" as listed in subsection (b);

(2) It is not within any category of "excluded service" as listed in subsection (c); and

(3) It is within any category of "Tennessee service" as listed in subsection (d).

"Included service" is then defined to include, as relevant to this appeal, a service performed by "[a]ny individual who, under the usual common-law rules applicable in determining the employer/employee relationship, has the status of an employee." Tenn. Code Ann. § 50-7-207(b)(2)(B).[7] As our supreme has court explained,

> The "common-law rules applicable in determining the employer/employee relationship" which apply under T.C.A. § 50-7-207(b)(2)(B) were stated in *Masiers v. Arrow Transfer & Storage Co.*, 639 S.W.2d 654 (Tenn. 1982): "There are a number of indicia to be considered by a trier of fact in determining the existence or nonexistence of an independent contractor relationship, such as (1) the right to control the conduct of the work, (2) the right of termination, (3) the method of payment, (4) the freedom to select and hire helpers, (5) the furnishing of tools and equipment, (6) self-scheduling of work hours, and (7) being free to render services to other entities." *Id.* at 656.

*Beare Co.*, 814 S.W.2d at 718.

The inquiry does not end, however, with the question of whether the common-law rules create an employer/employee relationship. Instead, the statute goes on to state the "special rules," referenced above in section 50-7-207(a):

---

decision against Appellant in February 2018. However, we note that section 50-7-207 did not change materially between June 6, 2011 and December 31, 2019.

[7] This particular requirement was substantially revised in the most recent amendments to the statute. *See* Tenn. Code Ann. § 50-7-207(b)(2)(B) (2020) (listing one definition of "included service" as, "Subject to the other provisions of this section, service performed after December 31, 1977, including service in interstate commerce, by . . . .[a]ny individual who performs services for an employer for wages if the services are performed by the individual qualify as an employer-employee relationship with the employer based upon consideration of the following twenty (20) factors as described in the twenty-factor test of Internal Revenue Service Revenue Ruling 87-41, 1987-1 C.B. 296: . . . .").

(e) SPECIAL RULES. The following rules shall govern for purposes of this section:

(1) Service performed by an individual shall be deemed to be included service for purposes of this *section regardless of whether the common law relationship of master and servant exists*, unless and until it is shown to the satisfaction of the administrator that:

(A) The individual has been and will continue to be free from control and direction in connection with the performance of the service, both under any contract for the performance of service and in fact;

(B) The service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and

(C) The individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed[.]

Tenn. Code Ann. § 50-7-207(e) (emphasis added). This is known as the "ABC test." ***Beare Co.***, 814 S.W.2d at 718. "[T]he taxpayer must satisfy each of the three parts of the [ABC] test in order to establish that the worker is not an employee." ***Id.***

The main dispute between the parties is whether the Designee's conclusion that the drivers are employees under the preceding statutory framework, such that Appellant owes delinquent unemployment taxes, is correct (and, in turn, whether the trial court's decision affirming the Designee's ruling is correct). To this end, the parties spend considerable effort in their briefs addressing both the common law and ABC tests.[8] We certainly appreciate the parties' diligence in briefing all of the issues that could become relevant in this case. We conclude, however, that it not necessary for this Court to similarly address both tests, as the ABC test is dispositive here.

Here, the ABC test explicitly states that its requirements apply "regardless of whether the common law relationship of master and servant exists[.]" Tenn. Code Ann. § 50-7-207(e)(1). There is no dispute in this case that "the usual common-law rules applicable in determining the employer/employee relationship[,]" Tenn. Code Ann. § 50-7-207(b)(2)(B), are generally synonymous with the rules governing whether a "common law relationship of master and servant exists[.]" Tenn. Code Ann. § 50-7-207(e)(1). *See **Beare Co.***, 814 S.W.2d at 719 (treating these questions as generally interchangeable);

---

[8] This case does not involve either "excluded service" or "Tennessee service" under Tennessee Code Annotated section 50-7-207(a).

***Shipley v. Tennessee Farmers Mut. Ins. Co.***, No. 01-A-01-9011-CV-00408, 1991 WL 77540, at *2 (Tenn. Ct. App. May 15, 1991) (citing the ***Masiers*** factors as relevant to the question of "whether an existing relationship is one of master and servant"); *cf.* ***Alverson v. Am. Nat. Ins. Co.***, 30 F. App'x 491, 496 (6th Cir. 2002) (citing the ***Masiers*** factors for determining whether the relationship is of principal and agent and noting that agent/principal liability "is the same as the liability of a master for the act of his servant"); ***Nelson v. Inman Homes, Inc.***, No. 1:12-CV-204, 2014 WL 12530945, at *8 (E.D. Tenn. Mar. 27, 2014), *report and recommendation adopted,* No. 1:12-CV-204, 2014 WL 2094327 (E.D. Tenn. Apr. 17, 2014) (citing the same factors outlined in ***Masiers*** "to demonstrate a master-servant relationship"). Thus, "regardless" of the outcome of the employer/employee relationship common law test, service done by a worker will be deemed to be "included service," unless and until the taxpayer shows each and every element of the ABC test. "In other words, if the [business] fail[s] to meet any one of the guidelines contained in T.C.A. § 50-7-207(e)(1) [i.e., the ABC test], the [workers] will be found to be employees and the business must pay an employment tax."[9] ***Beare Co.***, 814 S.W.2d at 719; *see also* ***Concord Enterprises***, 524 S.W.3d at 234 (affirming the trial court's judgment where the trial court confined its analysis to the ABC test and found that test to be dispositive, stating, "Although the Petitioner asserts it fits the definition of independent contractor under the seven-factor test of Tennessee common law, the Petitioner cited in its brief and acknowledged in oral argument that it must also satisfy [the ABC] test."). Because we conclude that the ABC test is dispositive in this case, we will not tax the length of this Opinion by addressing the non-dispositive common law test.[10]

Turning to the application of the ABC test to the facts of this case, we note again that the taxpayer has the burden to show all of the guidelines under the ABC test are met. ***Beare Co.***, 814 S.W.2d at 719. Consequently, if Appellant cannot establish one of the three parts, there is no need to analyze the remaining elements. *See* Tenn. Code Ann. § 50-7-207(e)(1); *cf.* ***Concord Enterprises***, 524 S.W.3d at 238 (considering only section 50-7-

---

[9] Perhaps because the application of the common law employment rules was made superfluous by the ABC test in the version of the statute applicable in this case, the statute was substantially revised in 2020. *See generally* 2019 Pub. Acts, c. 337, §§ 3, 4, eff. Jan. 1, 2020. The definition of "included service" was amended to remove mention of the common law. *See* Tenn. Code Ann. § 50-7-207(b)(2)(B) (2020) (listing one definition of "included service" as, "Subject to the other provisions of this section, service performed after December 31, 1977, including service in interstate commerce, by . . . . [a]ny individual who performs services for an employer for wages if the services are performed by the individual qualify as an employer-employee relationship with the employer based upon consideration of the following twenty (20) factors as described in the twenty-factor test of Internal Revenue Service Revenue Ruling 87-41, 1987-1 C.B. 296: . . . ."). And the ABC test was completely removed from the statute by the 2020 amendment. *See* 2019 Pub. Acts, c. 337, § 4. As such, this case largely asks us to interpret and apply a version of section 50-7-207 that is all but extinct.

[10] Because neither "excluded service" nor "Tennessee service" is at issue, our holding that the statutory test contained in section 50-7-207(e)(1) is dipositive regardless of the outcome of the common law master/servant test should not be read as controlling in any circumstances involving those types of service.

207(e)(1)(B) ("Part B" of the ABC test) and concluding that a business failed to establish that its workers were independent contractors and not employees when it failed to prove that it fulfilled Part B's requirements). We will therefore begin by analyzing Part B (section 50-7-207(e)(1)(B)), because that element is dispositive. Our supreme court has explained that under Part B,

> the taxpayer must establish that the services performed by the workers in question were performed *either* outside of the taxpayer's usual course of business *or* performed outside of all of the taxpayer's places of business . . . . Thus, the taxpayer has two alternative ways to satisfy the B prong of the test.

***Beare Co.***, 814 S.W.2d at 719 (emphases in original) (footnote, citation, and internal quotation marks omitted). Thus, Appellant can meet its burden under Part B by showing either of the two circumstances. The Designee found that the services performed in this case were both in Appellant's usual course of business and some were performed at Appellant's place of business. Following our review of Appellant's brief, however, we conclude that Appellant assigns error only as to the second element of Part B: whether the drivers' services are performed outside of Appellant's place of business. Because Appellant has chosen to focus solely on the second element of Part B, we likewise confine our review to that element. *See, e.g.*, ***Watson v. Watson***, 309 S.W.3d 483, 497 (Tenn. Ct. App. 2009) (citing Tenn. R. App. P. 13(b); ***Bing v. Baptist Mem'l Hosp.-Union City***, 937 S.W.2d 922, 924 (Tenn. Ct. App. 1996)) ("The appellate court may treat issues that are not raised on appeal as being waived.").

Whether the work performed by workers was "outside of all of the taxpayer's places of business" is a question of fact. *Cf.* ***Concord Enterprises***, 524 S.W.3d at 238 (holding that substantial and material evidence demonstrated that the workers performed their services at the taxpayer's place of business). As such, we must affirm the Designee's finding if there is substantial and material evidence to support it. Tenn. Code Ann. § 50-7-304(i)(2)(E); ***Concord Enterprises***, 524 S.W.3d at 238 (affirming the agency's decision because it was "was supported by evidence both substantial and material"); *see also* ***McEwen v. Tennessee Dep't of Safety***, 173 S.W.3d 815, 820 (Tenn. Ct. App. 2005) (explaining that under the substantially similar UAPA standard of review, "the court must examine the agency's factual findings to determine whether they are supported by substantial and material evidence").

Appellant argues that it satisfies Part B's second element "because the driving services are performed outside the place of [Appellant's] business in Gallatin, Tennessee." Appellant appears to claim that the driving is the service for which the drivers are engaged, and that takes place off of Appellant's premises. Additionally, Appellant argues that the fact "[t]hat drivers have to pick up and return the tour buses to [Appellant's] headquarters does not change the fact that virtually all of the services performed by the drivers (in terms

- 15 -

of time and certainly all the miles driven) take place off the premises of [Appellant]." In contrast, the Designee found that "[t]he drivers perform some duties such as pre-trip and post-trip tasks at [Appellant's] place of business."

While the driving clearly occurs off of Appellant's premises, there is substantial and material evidence in the record to support the Designee's finding that other services the drivers perform take place on Appellant's premises.[11] Namely, the pre- and post-trip inspections required of the drivers before and after each and every tour occur primarily on Appellant's lot. For example, the drivers are required to go through an extensive inspection checklist in the handbook before each tour, including "watering" their buses using water faucets located on Appellant's parking lot. Additionally, the handbook states, "DO NOT LEAVE THE LOT without taking care of your 'End of Tour Duties[.]' Your tour is not over until these things are done[.]" (Emphases in original). Other post-trip duties that the handbook requires the drivers to complete upon returning to "the shop," (which appears to refer to Appellant's place of business), include emptying the trash, cleaning out the fridge, ice chest, and the A/C roof air filters, draining the water system in the winter, and checking all fluid levels. The "tour" and the duties of Appellant's drivers therefore end only after they reach and complete duties on Appellant's premises.

Some of these pre- and post-trip duties are required by federal law, and others by Appellant independently of the law. For example, some of the pre-trip requirements in the handbook that derive from federal regulations, as the handbook states and as Mr. Blankenship testified, include checking and reporting any issues with the service brakes and steering mechanisms. Appellant points out that the applicable federal regulations state that they apply regardless of the status of a worker. Appellant fails to cite any authority, however, for the proposition that services required by law that are performed on a business's premises do not count as services for purposes of Part B.

Even assuming, *arguendo*, that only non-federally-mandated services are relevant to the inquiry of whether services are performed on Appellant's premises, Appellant does not argue that all of the drivers' duties are required under federal law. For example, once drivers drop their buses "at the shop, it is [their] responsibility to straighten up the interior (dump trash, wipe off counters, etc.)," and remove the sheets off the beds. Appellant points to no federal law that mandates this type of housekeeping work or that it must take place when the buses are "at the shop." Thus, Appellant voluntarily mandated that its drivers perform certain duties on every tour at its premises.

As best we can tell, Appellant next argues that these services should not be considered because the only service that Appellant's drivers perform is driving.

---

[11] We note that Appellant has argued that Mr. Hitchens' testimony is unreliable and should be disregarded because he is a biased and disgruntled former worker. We need not address this issue because Mr. Hitchens' testimony has no effect on our holding.

- 16 -

Respectfully, Appellant's own brief contradicts this argument at times, such as when it defines the "work" performed as the "driving of the buses *and the ancillary functions that are required at the beginning and end of trips*." (Emphasis added). To the extent that Appellant asserts that these "ancillary" functions should not be considered "service" for purposes of Part B, we respectfully disagree. For one, Appellant cites no law in which this Court has held that some mandated service is merely "ancillary" to the actual work performed by workers for purposes of Part B of the ABC test. *See **Sneed v. Bd. of Pro. Resp. of Supreme Ct.***, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived."). Our research has likewise not revealed a single case in which Tennessee courts have recognized any such distinction. Appellant cites ***Stratton v. United Inter-Mountain Tel. Co.***, 695 S.W.2d 947, 950 (Tenn. 1985) for the proposition that

> a party may have some right to control the results of the work without creating an employer/employee relationship. Thus, the fact that there were certain pre-trip and post-trip checklists does not convert the relationship to an employee relationship considering that the overwhelming majority of the services provided by the drivers take place during the tour when All Access has no contact with the driver and can therefore not exercise any control over the driver.

In ***Stratton***, however, the Court noted that this situation typically occurs when "an employer subcontracts work that is totally different from his regular line of work and therefore cannot be adequately performed by his own employees." ***Id.*** at 952. As a consequence of that situation, the employer "retained no right of control but was only interested in the final result." ***Id.*** Of course, that is not the situation here, as the purpose of Appellant's business was to provide drivers for tour companies.

Although not cited by Appellant in its discussion of Part B of the ABC test, we recognize that this Court appeared to have drawn some distinction between the service workers perform and other tasks required of them in ***HRP of Tennessee***. In that case, HRP, a nurse registry business, placed nurses at medical facilities on temporary assignments. 2006 WL 1763673, at *1. In affirming the administrative law judge's conclusion that the nurses were independent contractors, this Court emphasized that the "services" at issue in the ABC test are the "actual job duties undertaken by the worker," which in that case were caring for patients and "other tasks associated with" nursing. ***Id.*** at *5. The Court analogized to the ***Beare Company*** case, where Beare provided warehouse storage for food shippers and hired "hoppers" to unload the food from trucks and stack it on pallets, and it was determined that the hoppers were independent contractors. ***Id.*** at *5. We explained that even though Beare told the hoppers which trucks to unload and

> Beare was concerned that the food was properly stacked by the hoppers[,] and HRP was concerned that the nurses on its registry "perform clinical duties proficiently" and "[m]aintain good working relations with hospital staff while performing in a professional manner," neither Beare nor HRP supervised or directed the subject workers while the workers performed their assigned jobs.

*Id.* We also emphasized that even though the nurses had to, for example "obey at least some of HRP's instructions," "'read, understand and conform to all HRP policies,'" arrive "'no later than 15 minutes prior to the[ir] assigned shift[s],'" provide HRP "notice of any extra hours worked," and "sign HRP-generated paperwork and use HRP's time sheets," there was "no evidence that the nurses were controlled either vicariously or directly in the performance of their duties as nurses while working at the various medical facilities to which they were assigned." *Id.* at *4.

However, *HRP of Tennessee* and *Beare Co.* are distinguishable from the case-at-bar in a number of respects. First, the second element of Part B—whether services occurred at the taxpayer's place of business—was not at issue in *Beare Co.* Similarly, it was undisputed in *HRP of Tennessee* that the business satisfied Part B, and thus the Court offered no analysis of Part B. *Id.* at *6. Instead, the discussion of the nurses' work occurred only in the context of the business's argument that it had no control over the nurses. Perhaps for that reason, Appellant does not cite *HRP of Tennessee* in the portion of its brief analyzing Part B. The *Stratton* case was also not concerned with Part B of the ABC test, but rather the question of control for purposes of the Worker's Compensation Act. *Stratton v*, 695 S.W.2d at 952. Thus, neither *Stratton*, *HRP of Tennessee*, nor *Beare Co.* can be read to establish any definitive rule that is applicable to the specific question of what constitutes services at a taxpayer's places of business for purposes of Part B of the ABC test. *Cf.* *Staats v. McKinnon*, 206 S.W.3d 532, 550 (Tenn. Ct. App. 2006) (citing *Shousha v. Matthews Drivurself Serv., Inc.*, 210 Tenn. 384, 390, 358 S.W.2d 471, 473 (Tenn. 1962)) ("It is axiomatic that judicial decisions do not stand for propositions that were neither raised by the parties nor actually addressed by the court.").[12]

---

[12] This is one reason why Appellant's third issue—whether the trial court failed to apply *HRP of Tennessee* as binding precedent—does not constitute reversible error, as that case did not address the dispositive issue in this appeal. But even considering the issues that were actually decided in *HRP of Tennessee*, the case still does not constitute binding precedent from which the trial court was not free to depart. *HRP of Tennessee* is an unpublished case, and therefore not strictly binding. *See* Tenn. Sup. Ct. R. 4 (noting that except in some circumstances not present here, "unpublished opinions shall be considered persuasive authority" only); *see also* *Wyatt v. State*, No. M2019-00250-CCA-R3-PC, 2020 WL 1674014, at *8 (Tenn. Crim. App. Apr. 6, 2020) ("Because all of the relevant cases at the time of the trial court's decision in this case were unpublished opinions of this court, they constituted only persuasive authority and were not binding precedent."). Additionally, whether the trial court misapplied the case is effectively irrelevant, since our task here is essentially to review the correctness of the final agency decision. In other words, while we technically must affirm or reverse the trial court, our basis for doing so is whether the Designee's decision was correct, not whether the trial court misapplied precedent. Still, to

The standard of review applicable here is also a relevant factor. As previously discussed, we must affirm the Designee's finding that the workers here performed work at Appellant's place of business if there is substantial and material evidence to support it. *See Concord Enterprises*, 524 S.W.3d at 238. The same standard applied to the opposite conclusion in *HRP of Tennessee* and in *Beare Co.*: we were required to affirm the administrative factual findings supporting the determinations that the ABC test had in fact been satisfied by the taxpayers in those cases under the same deferential standard of review. As previously discussed, we cannot substitute our judgment for that of the Designee as to factual issues. *See* Tenn. Code Ann. § 50-7-304(i)(3). Thus, we are required to affirm even when it can be shown that reasonable minds can disagree about the correctness of the agency's decision. *See Meehan v. Bd. of Pro. Resp. of Supreme Ct. of Tennessee*, 584 S.W.3d 403, 413 (Tenn. 2019) (quoting *Bd. of Prof'l Responsibility v. Sheppard*, 556 S.W.3d 139, 146 (Tenn. 2018)) (holding that when the standard of review mandates that we not substitute out judgment for that of the administrative agency, we must uphold the ruling even "where reasonable minds can disagree over the propriety of [the] decision"). The fact that another case came to an opposite conclusion on somewhat similar facts will therefore not always mandate reversal. *Cf. Wright v. Knox Vinyl & Aluminum Co.*, 779 S.W.2d 371, 374 (Tenn. 1989) (noting that "[i]t is true that there are similarities between the facts of [a prior case] and the instant case," but concluding that the opposite result was nevertheless warranted in the case-at-bar because the deferential standard of review applicable in the prior case mandated its result, unlike the case-at-bar). *But see Rogers v. Adventure House LLC*, 617 S.W.3d 542, 550 (Tenn. Ct. App. 2020) (citations omitted) (noting that even in cases reviewed under deferential standards of review, the trial court is "not unbounded" but "must consider controlling legal principles and relevant facts").

Applying this deferential standard of review, we cannot conclude that no substantial and material evidence was presented that Appellant's workers indeed performed work at Appellant's place of business. Here, the evidence shows that the work performed by Appellant's workers at its premises was not so inconsequential that we must disregard it for purposes of determining whether work was performed on Appellant's premises. Instead, we agree with the trial court's characterization of this case as compared to *Beare Co.* and *HRP of Tennessee*:

> An hour of prep work conducted on [Appellant's] premises in contrast with a 15 minute early arrival at the client's premises does not make *HRP* comparable. Arriving early at the hospital before a shift, . . . notifying the agency of any extra hours worked, submitting paperwork—these could all be done by the independently contracted nurses without ever stepping foot in HRP's place of business. Here, the pre-trip duties [Appellant] required of its drivers had to occur before the bus left [Appellant's] lot, and the post-trip

the extent that *HRP of Tennessee* may be relevant to that review, we have addressed it.

- 19 -

duties did not begin until the bus had returned to [Appellant's] lot. . . . Beare did not require the hoppers to stay behind after the "actual service" was performed in order to break down the pallets, take out the trash, and sweep the warehouse floors. . . . [Appellant] cannot argue to the Court that these [non-driving services] are not part of the "actual service" and demand them from the drivers in the same breath.

(Internal citation omitted). Thus, even if **HRP of Tennessee** could be read as addressing Part B of the ABC test, it is entirely distinguishable from the case-at-bar; nothing in that opinion indicates that the subject nurses ever did any work whatsoever at HRP's place of business. 2006 WL 1763673, at *4.

Finally, we note that the language of section 50-7-207(a)(B) is broad: in order to meet its burden under the second element of Part B, the taxpayer must demonstrate that "[t]he service . . . is performed outside of *all* the places of business of the enterprise for which the service is performed[.]" (Emphasis added). While "included service" is defined in detail, as discussed *supra*, Appellant does not point to any place in the statute where the term "service" is specifically defined or limited. In the absence of any authority to support such a reading, we simply cannot read this broad language as including some silent provision that ancillary services should be excluded from consideration. Indeed, caselaw on this issue leads us to the opposite conclusion.

For example, in **Carpet Barn, Inc. v. Neel**, No. 86-332-II, 1987 WL 7971 (Tenn. Ct. App. Mar. 20, 1987), we held that the chancellor's finding that "Part B of the test [wa]s clearly not met" was correct, where salesmen "did part of their work at the plaintiff's facility[.]" *Id.* at *3 (citing Tenn. Code Ann. § 50-7-207(5)(B), the prior but materially similar version of Tenn. Code Ann. § 50-70-207(e)(1)(B)). In **Carpet Barn**, the proof showed that some sales associates worked at locations other than Carpet Barn or out of their own homes, and sales personnel were "required to go to the homes of customers to show samples and to take measurements[.]" *Id.* at *2. The fact that a substantial portion of the work was performed outside of the taxpayer's place of business, however, was not sufficient. Instead, we held that the chancellor was correct to require the taxpayer to show that "services were [] *entirely* performed 'outside of all of the places of business . . . for which the service is performed.'" *Id.* at *3 (emphasis added). Thus, so long as services were "not entirely performed" outside of Appellant's place of business, the second element of Part B is "clearly not met." *Id.*[13]

---

[13] In other sections of its brief, Appellant claims that the drivers are agents of the tour, the "ancillary" duties they perform are "a product of the lease of the bus by the tour company," and the tour, not the driver, is responsible for the pre- and post-trip duties under its lease with Appellant. To the extent that Appellant means to argue that Appellant is not the "*enterprise* for which the service is performed," Tenn. Code Ann. § 50-7-207(e)(1)(B) (emphasis added), it has not developed or supported that argument sufficiently for us to review them, at least with respect to our analysis of Part B. *See* **Sneed**, 301 S.W.3d at 615.

The same is true in this case. Here, substantial and material evidence supports the Designee's finding that some work was performed by Appellant's drivers at Appellant's place of business. Because Appellant failed to satisfy Part B of the ABC test, the Designee did not err in concluding that Appellant cannot prevail under the ABC test, meaning it cannot prevail at all. Thus, taking the facts that are supported by substantial and material evidence and applying a de novo review to the Designee's application of the ABC test to this case, we conclude that the Designee did not err in finding that the drivers here are employees and Appellant therefore must pay unemployment taxes.[14] The decision of the Designee was therefore neither arbitrary nor capricious, nor based on a clear error in judgment. *Miller*, 271 S.W.3d at 665. While we may have arrived at a different conclusion than the Designee were we in its position, the standard of review does not permit us to reverse an agency's determination on that basis. Reasonable minds can differ as to the proper outcome in this case, but as long as the agency's decision is within the bounds of reason, we are compelled to affirm it. *Cf. id.* Therefore, the Designee's decision is affirmed, as is the trial court's judgment. All other issues are pretermitted.

## CONCLUSION

The judgment of the Davidson County Chancery Court is affirmed. This cause is remanded for further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are assessed to Appellant All Access Coach Leasing, LLC, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[14] We emphasize that the issue in this case regarding worker classification is confined to the context of the Security Law and its corresponding regulations. Whether workers are employees for purposes of other areas of the law is not at issue here.